**FILED**
CLERK, U.S. DISTRICT COURT

2/15/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CDO___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2023 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No.  2:24-cr-00103-MWF |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1341: Mail Fraud; 26 U.S.C. § 7201: Attempt to Evade and Defeat Tax; 26 U.S.C. § 7206(1): Subscription to a False Tax Return] |
| ROGER KEITH VER, | |
| Defendant. | |

The Grand Jury charges:

COUNTS ONE THROUGH THREE

[18 U.S.C. § 1341]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

Defendant VER and His Companies

1.    Defendant ROGER KEITH VER, who was born in San Jose, California, resided in Tokyo, Japan, and Saint Kitts and Nevis ("St. Kitts"). Defendant VER was in a long-term relationship with a Japanese citizen ("partner").

2.    Defendant VER was the sole owner and Chief Executive Officer ("CEO") of MemoryDealers.com, Inc., and Agilestar.com, Inc.,

two businesses that were based in Santa Clara, California, and sold computer and networking equipment. MemoryDealers and Agilestar were small business corporations ("S-Corporations") until March 3, 2014, when by operation of law they were automatically converted to C-Corporations.

Bitcoins

3.   Bitcoins were a cryptocurrency circulated over the internet. Bitcoins were not issued by any government, bank, or company, but rather were controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoins were sent to and received from bitcoin addresses, which were analogous to bank account numbers and consisted of strings of case-sensitive letters and numbers, each 26 or more characters long. Each bitcoin address was controlled through the use of a private key that was the equivalent of a password or PIN and was necessary to access the bitcoins associated with the bitcoin address.

4.   Bitcoin transactions were recorded on the bitcoin blockchain. The bitcoin blockchain was a decentralized public ledger on which were recorded all bitcoin transactions in which a bitcoin address sent or received bitcoins. The bitcoin blockchain was updated approximately six times per hour. All records on the bitcoin blockchain were publicly available.

5.   Generally, a bitcoin wallet was an application that allowed bitcoin users to easily send and receive bitcoins and store their private keys. Users typically acquired bitcoins by purchasing them through a cryptocurrency exchange.

<u>Defendant VER's and His Companies' Acquisition of Bitcoins</u>

6.   Defendant VER began acquiring bitcoins no later than April 2011. Defendant VER also avidly promoted bitcoins, even obtaining the moniker "Bitcoin Jesus."

7.   Defendant VER opened accounts on MemoryDealers' behalf at several cryptocurrency exchanges. He wired and caused to be wired funds from MemoryDealers' and Agilestar's bank accounts to those exchanges to purchase bitcoins for them. For example:

a.   In April 2011, defendant VER opened an account in MemoryDealers' name at Mt. Gox, a cryptocurrency exchange, using his own MemoryDealers' e-mail address. Defendant VER repeatedly wired and caused to be wired funds from MemoryDealers' and Agilestar's bank accounts to the Mt. Gox account to purchase bitcoins. Defendant VER transferred MemoryDealers' and Agilestar's bitcoins from Mt. Gox to bitcoin wallets that defendant VER controlled on their behalf.

b.   In June 2012, defendant VER also opened an account on MemoryDealers' behalf at Bitstamp, another cryptocurrency exchange. When he opened the account, defendant VER provided MemoryDealers' articles of incorporation and indicated he was MemoryDealers' sole owner. He also provided a copy of a recent MemoryDealers' bank statement. Defendant VER repeatedly wired and caused to be wired funds from MemoryDealers' bank account to Bitstamp to purchase bitcoins. Defendant VER transferred MemoryDealers' bitcoins from Bitstamp to bitcoin wallets that defendant VER controlled on MemoryDealers' behalf.

8.   Defendant VER also caused MemoryDealers to acquire bitcoins by using MemoryDealers' money to purchase them directly from sellers.

9.   MemoryDealers used bitcoins to conduct its business. Beginning in or around October 2011, and continuing until at least on or about June 18, 2017, MemoryDealers paid certain vendors in bitcoins. MemoryDealers received payments from customers in bitcoins through September 2017. On or about November 1, 2012, MemoryDealers launched Bitcoinstore.com. MemoryDealers, doing business as Bitcoinstore.com, accepted payment in bitcoins for products it sold on the internet. Bitcoinstore.com operated until approximately July 31, 2014.

10.   Defendant VER also used his own funds to purchase bitcoins. For example, on or about July 23, 2012, defendant VER opened an account in his own name at Coinbase, another cryptocurrency exchange.

11.   On or about November 30, 2013, defendant VER donated 1,000 of his personally held bitcoins, valued at $1,065,145, to a charity qualified under section 501(c)(3) of the Internal Revenue Code. On or about November 6, 2014, defendant VER filed an Amended U.S. Individual Income Tax Return (Form 1040X) for tax year 2013 on which he claimed a deduction for this donation.

<u>Defendant VER's Expatriation</u>

12.   United States citizens could renounce their U.S. citizenship, a process known as expatriation.

13.   Under the Internal Revenue Code ("IRC"), expatriation from the United States by a person who qualified as a "covered expatriate" had tax implications. Specifically, all of a covered expatriate's property was treated as having been sold on the day before the expatriation date for its fair market value—referred to as a "constructive sale"—and any gain arising from that constructive sale

was required to be taken into account for that taxable year and was subject to tax, which was referred to as an "exit tax."

14.   Under the IRC, covered expatriates were also required to file an Initial and Annual Expatriation Statement (Form 8854) with the Internal Revenue Service ("IRS"). Covered expatriates were required to certify on their Forms 8854 that they had complied with their tax obligations in the five years before expatriation and, among other things, provide information about their net worth, income, assets, and liabilities as of the date of their expatriation.

15.   In August 2012, defendant VER hired Law Firm 1 to advise him about expatriating and later hired Law Firm 1 to assist with his expatriation and prepare his 2014 U.S. Nonresident Alien Income Tax Return (Form 1040NR) and Initial and Annual Expatriation Statement (Form 8854) (collectively the "expatriation-related tax returns").

16.   Law Firm 1 also advised defendant VER to hire an appraiser to value MemoryDealers and Agilestar. As described below, defendant VER hired two different appraisers to do so. Appraiser 1 was a large, international accounting firm that defendant VER retained in 2012; Appraiser 2 was a solo practitioner that defendant VER retained in 2015.

17.   On February 4, 2014, defendant VER became a St. Kitts citizen. On March 3, 2014, defendant VER furnished to the United States Consulate in Barbados a signed Request for a Determination of Possible Loss of Citizenship (Form DS-4079), which included in Part II, a separately signed Statement of Voluntary Relinquishment of U.S. Citizenship. The U.S. Department of State subsequently issued him a Certificate of Loss of Nationality of the United States (Form DS-4083) that said defendant VER expatriated as of February 4, 2014.

18.   Under the IRC, however, a U.S. citizen is determined to have expatriated for the purposes of computing the exit tax and preparing the Form 8854 on the earliest of four events. The earliest of those four events applicable to defendant VER was the furnishing of his Statement of Voluntary Relinquishment of U.S. Citizenship to the U.S. Consulate on March 3, 2014.

19.   Defendant VER was a covered expatriate because his net worth on that day was at least $2,000,000. As such, defendant VER was required to prepare and file a Form 8854 and to pay an exit tax on any gain from the constructive sale of his worldwide assets as of March 2, 2014, and to report his worldwide assets on a Form 8854 as of March 3, 2014.

20.   However, Law Firm 1 erroneously advised him, based on the date referenced in the U.S. Department of State's Certificate of Loss of Nationality, that he expatriated for tax purposes on February 4, 2014, and had to pay the exit tax based on the constructive sale of his worldwide assets as of February 3, 2014.

21.   Law Firm 1 prepared and defendant VER signed and filed his expatriation-related tax returns incorrectly using February 4, 2014, as the date of his expatriation.

Clustering Analysis

22.   Clustering analysis, described below, combined with other attribution evidence, establishes that on February 3, 2014, defendant VER owned approximately 131,000 bitcoins either directly or through his companies.

23.   The clustering analysis used information from the blockchain to group bitcoin addresses together into clusters based on co-spending. Co-spending occurred when multiple bitcoin addresses

sent bitcoins in a single transaction, indicating that a single owner held the private keys for all those addresses. A cluster could be labeled based on its root address, namely, the earliest existing bitcoin address in the cluster.

24.  The clustering analysis establishes that the bitcoins referenced in paragraph 22 above were contained within at least four clusters of bitcoin addresses. These four clusters held bitcoins on February 3, 2014, as follows:

| Cluster | Root Address | Bitcoins on 2/3/2014 |
|---------|--------------|----------------------|
| 1 | 1E6mijNx2xKzRt6KXiqZncUmybgYN4cn2X ("Cluster 1E6mij") | 110,000.0491 |
| 2 | 1JKPkpDFruDNjFKQ5upDkB2CbstbR3RtE7 ("Cluster 1JKPkp") | 2,000.9710 |
| 3 | 1LXrSb67EaH1LGc6d6kWHq8rgv4ZBQAcpU ("Cluster 1LXrSb") | 4,037.8632 |
| 4 | 1LDWDufjU5ATbozDZY3uChb7oPAbDaiB7K ("Cluster 1LDWDu") | 15,000.0005 |

25.  Clustering analysis also establishes that on March 2, 2014, defendant VER owned either directly or through his companies nearly the same number of bitcoins contained in at least the same four clusters.

B.  THE SCHEME TO DEFRAUD

26.  Beginning no later than in or about October 2012, and continuing through at least in or about December 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant VER knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud the United States Department of the Treasury as to material matters, and to obtain money and property by means of materially false and fraudulent

pretenses, representations, and promises, and the concealment of material facts, regarding the number and value of bitcoins he owned and controlled both personally and through his companies.

27.   The scheme to defraud operated, in substance, as follows:

a.   In August 2012, Defendant VER hired Law Firm 1 to assist with his potential expatriation, including estimating any potential exit tax. Law Firm 1 told defendant VER that to estimate his exit tax, he should "pretend" to sell all of his assets on the day before his anticipated expatriation and calculate a tax on any gain from those pretend sales above $651,000.

b.   After defendant VER was so advised, but before he was able to expatriate in 2014, he concealed and provided false information to his various advisors regarding the number and value of bitcoins he owned and controlled both personally and through his companies. For example:

i.   In October 2012, defendant VER provided to Law Firm 1 a purported list of his assets and proposed exit tax calculation. The list of assets did not include any bitcoins.

ii.   Defendant VER engaged Appraiser 1 in August 2012. During the course of Appraiser 1's engagement, Appraiser 1 prepared multiple draft valuations of MemoryDealers and Agilestar. Appraiser 1 repeatedly advised defendant VER that the bitcoins listed as assets on MemoryDealers' and Agilestar's financial records should be valued at their current market price and asked defendant VER for the number of bitcoins held by the companies.

iii. In response, defendant VER did not provide Appraiser 1 with the total number of bitcoins the companies held and instead purported to provide the total number of bitcoins in his

8

possession. But the figures he provided were substantially lower than the number of bitcoins attributable to him and his companies. For example, on or about April 12, 2013, defendant VER told Appraiser 1 that he controlled 25,000 bitcoins, when approximately 117,000 bitcoins were attributable to him and his companies on that date, with approximately 70,000 held by defendant VER's companies.

iv.  Appraiser 1 did not finalize its valuations because on or about May 15, 2013, defendant VER informed Appraiser 1 that he was not going to be able to expatriate soon and requested that Appraiser 1 indefinitely delay its work.

v.  Throughout this time, Defendant VER sought advice from Appraiser 1, Law Firm 1, and MemoryDealers' and Agilestar's outside return preparers about whether the best way to minimize his exit tax and post-expatriation tax liabilities would be to distribute MemoryDealers' and Agilestar's bitcoins to himself.

vi.  Also throughout this time, defendant VER continued to acquire bitcoins for his companies and to invest bitcoins in, or to loan bitcoins to, bitcoin-related startups.

c.  After failing to obtain citizenship in several other countries, in early December 2013, defendant VER told Law Firm 1 that he believed he would be able to obtain citizenship from St. Kitts and renounce his U.S. citizenship by the end of the year.

d.  Law Firm 1 warned defendant VER that "doing so will mean (tax-wise) that you are diving off the high dive into the pool without checking how much water is in the pool. Meaning—when you renounce you have committed yourself and whatever the tax results are, they are. No adjustments are possible."

e.   After defendant VER retained Law Firm 1 in January 2014 to assist with his expatriation, including calculating his estimated exit tax payment, and while Law Firm 1 prepared and filed his expatriation-related tax returns, defendant VER continued to conceal and provide false information to his advisors regarding the number and value of bitcoins he owned and controlled both personally and through his companies. For example:

i.   On February 3, 2014, the day Law Firm 1 advised defendant VER to use when calculating his exit tax, he had approximately 131,000 bitcoins that could be attributed to him and his companies. Based on an analysis of their financial records, about 73,000 of these bitcoins could be attributed to MemoryDealers and Agilestar. Bitcoins traded on February 3, 2014, between $782 and $960 across several large bitcoin exchanges. From April 2011 to January 1, 2013, when defendant VER and his companies acquired most of their bitcoins, bitcoins traded at no more than about $32.00 across several large bitcoin exchanges.

ii.   In or around April 2014, Law Firm 1 attempted to estimate defendant VER's exit tax so that defendant VER could make an estimated tax payment for 2014. On or about April 5, 2014, Return Preparer 1, an employee at Law Firm 1, sent defendant VER an estimation of defendant VER's exit tax of $3,990,000. A few days later, Return Preparer 1 updated it, reducing the estimated exit tax to $3,400,000. The spreadsheet Return Preparer 1 used to compute that figure listed a total value of only $3,000,000 for "[b]itcoins held in personal wallets," listed defendant VER as the 100% owner of the bitcoins, and noted that defendant VER had provided the estimate of

the bitcoins' value. The spreadsheet did not list how many bitcoins defendant VER personally owned.

iii. Defendant VER did not make any estimated tax payments for 2014.

iv. A year later, when Law Firm 1 was preparing defendant VER's expatriation-related tax returns, Return Preparer 1 e-mailed defendant VER on or about April 10, 2015, requesting additional information about defendant VER's assets. Return Preparer 1 asked defendant VER how many bitcoins defendant VER owned and what he had paid for them. When he responded a few days later, defendant VER did not provide the requested information and instead discussed various aspects of the bitcoin market.

v. On or about August 3, 2015, Return Preparer 1 e-mailed defendant VER and proposed using an $800 per bitcoin value for defendant VER's personally held bitcoins. Defendant VER rejected Return Preparer 1's proposal as unreasonable, claiming that he had so many bitcoins that if he had had to sell them all on a single day in February 2014 it would have crashed the market. Defendant VER did not specify how many bitcoins he had but suggested a value of his personal bitcoin holdings of $9,200,000.

vi. A few weeks later, Return Preparer 1 told defendant VER that Lawyer 1, another employee of Law Firm 1, had determined that they had to use the $800 per bitcoin value and again asked defendant VER how many bitcoins defendant VER personally held. Defendant VER withheld the requested information once more, and instead said that using the $800 per bitcoin value was "impossible and unreasonable." Lawyer 1 later told defendant VER that they were legally required to use the $800 per bitcoin value.

vii. In August 2015, Lawyer 1 also asked defendant VER about his personal bitcoin holdings, specifically about how he had come to own bitcoins through bitcoinstore.com. Defendant VER responded that MemoryDealers "kept as many of the bitcoins as possible." In response to Lawyer 1's follow-up questions, defendant VER remarked that bitcoin wallets "were not registered to any name or associated with a tax id, and that no one, including the IRS, can freeze ones [sic] bitcoin accounts or seize ones [sic] bitcoins." Defendant VER also asserted that all the bitcoins obtained from "MemoryDealers / Bitcoinstore were held in bitcoin wallets that only [he was] able to access." Defendant VER stated that he believed a "smart tax strategy would be for [the bitcoins] to have been transferred to [his] personal ownership whenever it would have been cheapest to have done so from a tax perspective."

viii.   While Law Firm 1 was preparing defendant VER's expatriation-related tax returns, it reminded defendant VER of his need to obtain valuations of MemoryDealers and Agilestar. Instead of returning to Appraiser 1, who had already prepared draft valuations, in June 2015 defendant VER retained Appraiser 2 to start the process anew.

ix.  In August 2015, Appraiser 2 prepared valuations of MemoryDealers and Agilestar based in large part on the companies' financial records and tax returns using a valuation date of February 4, 2014.

x.   On or about August 4, 2015, Appraiser 2 sent draft valuations to Employee 1, a MemoryDealers' employee. Appraiser 2 valued MemoryDealers at $2,250,000, which included bitcoins valued

at $1,304,054, and valued Agilestar at $4,310,000, which included bitcoins valued at $113,582.

xi.  Employee 1 forwarded the draft valuations to Return Preparer 2, one of MemoryDealers' and Agilestar's outside return preparers, and requested Return Preparer 2's input. Return Preparer 2 responded by e-mail, questioning the valuation of the companies' bitcoins, and told Employee 1 to ask Appraiser 2 "if the Bitcoin values are market value on the dates of valuation." Return Preparer 2 explained that the "value should be: total Bitcoins x Average Market Price on Date of Valuation (2/3/14). If the value shown is that value, no problem; otherwise, an adjustment should be made, up or down, to show [Fair Market Value] of Bitcoins on that date."

xii. Employee 1 forwarded Return Preparer 2's e-mail to defendant VER.

xiii.   On or about August 13, 2015, Employee 1 confirmed with Appraiser 2 that the previously provided draft valuations were the final versions. No adjustments had been made in response to Return Preparer 2's concern.

xiv. Employee 1 then forwarded the valuations to Law Firm 1, which subsequently incorporated them into defendant VER's expatriation-related tax returns. At no time did defendant VER object to the incorrect valuations prepared by Appraiser 2, which defendant VER then knew would be incorporated into his expatriation-related tax returns.

xv.  As part of the return preparation process, on or about October 14, 2015, Return Preparer 1 e-mailed defendant VER a list of his bank and trading accounts of which Return Preparer 1 was

aware. Return Preparer 1 requested defendant VER provide any
additional accounts not listed. Defendant VER responded, identifying
an additional trading account but failed to disclose his account at
Coinbase, which held some of defendant VER's bitcoins on February 4,
2014. And a few weeks before this e-mail, defendant VER had sent
Lawyer 2, at Law Firm 2, who was also assisting defendant VER with
his expatriation, bitcoins from his Coinbase account. Defendant VER's
Coinbase account had bitcoins on March 3, 2014, as well.

xvi. Also on or about October 14, 2015, Return
Preparer 1 e-mailed defendant VER and requested once again that he
provide the total number of bitcoins he owned on February 4, 2014.
Return Preparer 1 copied Lawyer 1 on the e-mail. Yet again, defendant
VER did not tell them how many bitcoins he had. He instead asked,
"[c]ompletely hypothetically speaking, what would the ramifications
be if I were to have had 200,000 [bitcoins] at the time of my
renunciation?"

xvii.    Lawyer 1 replied and advised defendant VER
to obtain an appraisal of his personally held bitcoins from a "third
party who [had] no personal interest in the tax implications of the
appraisal."

xviii.    A week later, defendant VER asked Appraiser
2 if Appraiser 2 could provide a valuation for "an amount of Bitcoins
as of Feb 4th 2014 in an illiquid market?"

xix. In a follow-up e-mail, defendant VER asked if
Appraiser 2 could assist, stating "I actually have all the
information you need to make it super easy for you. I would just need
to explain it all, and then you would affix your name to it."

1              xx.   Approximately two weeks later, Appraiser 2

2    responded to defendant VER, indicating he would take a look at the

3    information. Appraiser 2 requested that defendant VER "state how many

4    bitcoins are subject to appraisal...."

5              xxi. Instead of providing the requested information,

6    defendant VER responded by discussing the state of the bitcoin market

7    at the time of his expatriation. He also asked Appraiser 2 to opine

8    on how Appraiser 2 would hypothetically value someone's bitcoins if

9    the number of bitcoins was substantially more than the total number

10   traded on that day.

11             xxii.   Instead of addressing defendant VER's

12   hypothetical, Appraiser 2 wrote back and only said "What was your

13   BitCoins [sic] holding as of February 4, 2014." Despite having

14   previously said that he had all the information for Appraiser 2,

15   defendant VER responded and said that he was not sure how many

16   bitcoins he had and asked another hypothetical about how Appraiser 2

17   would approach valuing 20,000 bitcoins.

18             xxiii.   In response to defendant VER's hypothetical,

19   Appraiser 2 said that the value per bitcoin could be between $100 to

20   $800. Defendant VER then paid Appraiser 2 to prepare a valuation of

21   his personally held bitcoin.

22             xxiv.   On or about November 24, 2015, Lawyer 1

23   responded to an email from defendant VER. Despite having final

24   appraisals of MemoryDealers and Agilestar for several months,

25   defendant VER had raised a concern with Lawyer 1 about "figuring out"

26   which bitcoins were his and which were MemoryDealers'. In response,

27   Lawyer 1 told defendant VER that the appraisal for MemoryDealers

28   included bitcoins valued at $1.3 million based on the company's

15

financial records but that Lawyer 1 did not know how many bitcoins this corresponded to or how that value was calculated. Lawyer 1 advised defendant VER not to include MemoryDealers bitcoins as part of the valuation of his personally held ones. Lawyer 1 also requested that if defendant VER was uncertain about how the bitcoins were allocated between himself and MemoryDealers to let Lawyer 1 know so they could reevaluate. Over the next several weeks, Lawyer 1 followed up with defendant VER on this issue, but defendant VER did not respond.

xxv. On or about December 3, 2015, defendant VER formally requested that Appraiser 2 prepare a valuation of 25,000 bitcoins and confirmed that he held those bitcoins personally. Around the same time, defendant VER told Lawyer 1 that the issue of how many bitcoins he personally owned had been taken care of and that he had provided Appraiser 2 with his best estimate.

xxvi.    After some back and forth between defendant VER and Lawyer 1, and defendant VER and Appraiser 2 about whether the bitcoins were held by defendant VER, his partner, or his company, on or about December 7, 2015, defendant VER once again confirmed that the 25,000 bitcoins were held by him personally "and [did] not include any other bitcoins that [he] may have been holding custodially for others."

xxvii.    On or about January 11, 2016, Appraiser 2 told defendant VER that it would make a significant difference in the valuation if he owned the bitcoins personally or if a company owned them.

xxviii.    A few days later, defendant VER wrote in an e-mail to Lawyer 1 and others that "reading between the lines of what

1   [Appraiser 2] said, it [sounded] like the appraisal will be MUCH

2   lower if the bitcoins are owned by a corporate entity rather than

3   myself personally." Defendant VER further stated, "[p]erhaps it will

4   be easier for tax reporting requirements if I gave all my bitcoins to

5   my partner (not legally married wife) in Japan?"

6              xxix.    Defendant VER caused Law Firm 1 to prepare

7   and mail on or about April 28, 2016, a United States Gift (and

8   Generation-Skipping Transfer) Tax Return (Form 709), falsely claiming

9   that defendant VER had gifted 25,000 bitcoins to his partner on

10  November 15, 2011. Defendant VER signed the Form 709 under penalties

11  of perjury on or about April 15, 2016. The IRS received the Form 709

12  on or about May 4, 2016.

13             f.    Defendant VER caused Law Firm 1 to prepare and mail on

14  or about May 4, 2016, defendant VER's 2014 U.S. Nonresident Alien

15  Income Tax Return (Form 1040NR). This Form 1040NR failed to report

16  any gain from the constructive sale of any bitcoins that defendant

17  VER personally owned and substantially underreported gains from the

18  constructive sales of MemoryDealers and Agilestar, which were based

19  on Appraiser 2's August 2015 valuations discussed in paragraph 27(e),

20  above. The return listed a total tax due of $1,032,845. Defendant VER

21  signed the Form 1040NR under penalties of perjury on or about April

22  15, 2016. The IRS received the Form 1040NR on or about May 10, 2016.

23             g.    Defendant VER also caused Law Firm 1 to prepare and

24  mail on or about May 4, 2016, defendant VER's 2014 Initial and Annual

25  Expatriation Statement (Form 8854) that failed to report personally

26  owned bitcoins and underreported the fair market values of

27  MemoryDealers and Agilestar. Defendant VER signed the Form 8854 under

28

penalties of perjury on or about April 15, 2016. The IRS received the Form 8854 on or about May 10, 2016.

h.   On or about July 13, 2016, Return Preparer 1 was erroneously informed that the IRS had not received the 2014 Form 1040NR and Form 8854 that were mailed on or about May 4, 2016. On or about July 14, 2016, defendant VER re-signed those returns, and on or about July 19, 2016, Law Firm 1 mailed them to the IRS. The IRS received these returns on or about July 22, 2016.

i.   As further part of his scheme, defendant VER also fraudulently misrepresented and concealed income he received in 2017 from the distributions of MemoryDealers' and Agilestar's bitcoins to him. For example:

i.   On or about March 17, 2016, defendant VER learned from Return Preparer 3, another one of MemoryDealers' and Agilestar's outside return preparers, that upon his expatriation when MemoryDealers and Agilestar became C-Corporations, all of MemoryDealers' and Agilestar's assets "rolled into" them.

ii.   After defendant VER expatriated and continuing through June 2017, MemoryDealers continued to acquire and/or spend bitcoins, and Agilestar continued to own bitcoins.

iii. By 2017, defendant VER had opened personal accounts at several other cryptocurrency exchanges such as Kraken, Bitfinex, Bittrex, and Poloniex.

iv.   On or about June 19, 2017, after paying an invoice issued to MemoryDealers with bitcoins, defendant VER instructed Employee 1 to "close out" the bitcoin balance, which resulted in the removal of all bitcoins as assets from the financial records of MemoryDealers and Agilestar. On that date, MemoryDealers'

financial records showed that it had approximately 58,000 bitcoins; Agilestar's financial records showed it had approximately 12,000.

v. In the two weeks before defendant VER instructed Employee 1 to remove the bitcoins from MemoryDealers' financial records, defendant VER had transferred nearly 3,000 bitcoins—worth over $7 million—from Cluster 1JKPkp to defendant VER's personal account at Poloniex.

vi. In November 2017, defendant VER transferred tens of thousands of bitcoins from Cluster 1E6mij and Cluster 1LDWDu to exchange accounts in his name and then sold them for United States dollars. He then transferred approximately $240 million from those exchange accounts to bank accounts either in his name or under his control in the Bahamas.

vii. Defendant VER retained Law Firm 1 to prepare his 2017 Form 1040NR. On or about July 26, 2018, Return Preparer 1 asked defendant VER if he had received any income or distributions from MemoryDealers or Agilestar during 2017. Defendant VER said that he had not. Defendant VER also did not tell Return Preparer 1 that he had received hundreds of millions of dollars from the sale of bitcoins in 2017.

viii. As a result of defendant VER's concealment of the distributions of MemoryDealers' and Agilestar's bitcoins to him in 2017, the 2017 Form 1040NR that defendant VER caused Return Preparer 1 to prepare and mail on or about December 15, 2018, did not report any gain or pay any tax related to those distributions.

j. The false and fraudulent statements and representations and material omissions on the 2014 Form 1040NR, 2014 Form 8854, and the 2017 Form 1040NR that defendant VER caused to be

prepared and mailed to the IRS collectively deprived the IRS of taxes rightfully due in the amount of approximately $48 million.

C.   USE OF THE MAILS

28.   On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant VER, for the purpose of executing the above-described scheme to defraud, knowingly caused the following items to be placed in a post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service according to the directions thereon:

| COUNT | DATE | ADDRESS | MAIL MATTER |
|-------|------|---------|-------------|
| ONE | May 4, 2016 | Internal Revenue Service P.O. Box 1303 Charlotte, NC 28201-1303 | Defendant VER's false 2014 Forms 1040NR and 8854 |
| TWO | July 19, 2016 | Department of the Treasury Internal Revenue Service Austin, TX 73301-0215 | Defendant VER's false 2014 Forms 1040NR and 8854 |
| THREE | December 15, 2018 | Internal Revenue Service P.O. Box 1303 Charlotte, NC 28201-1303 | Defendant VER's false 2017 Form 1040NR |

COUNT FOUR

[26 U.S.C. § 7201]

29.   The Grand Jury realleges paragraphs 1 through 25 and 27 of this Indictment here.

30.   Beginning no later than on or about January 1, 2014, and continuing through on or about December 18, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant VER willfully attempted to evade and defeat income tax due and owing by him to the United States of America, for the calendar year 2014, by committing the following affirmative acts, among others, on or about the following dates:

a.    preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed with the IRS on May 10, 2016, a false 2014 U.S. Nonresident Alien Income Tax Return (Form 1040NR) that failed to report gain from the constructive sale of personally owned bitcoins and substantially underreported gains from the constructive sales of MemoryDealers and Agilestar;

b.    preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed with the IRS on May 10, 2016, a false 2014 Initial and Annual Expatriation Statement (Form 8854) that failed to report personally owned bitcoins and underreported the fair market values of MemoryDealers and Agilestar;

c.    preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed with the IRS on July 22, 2016, a false 2014 U.S. Nonresident Alien Income Tax Return (Form 1040NR) that failed to report gain from the constructive sale of personally owned bitcoins and substantially underreported gains from the constructive sales of MemoryDealers and Agilestar;

d.    preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed with the IRS on May 4, 2016, a false 2011 United States Gift (and Generation-Skipping Transfer) Tax Return (Form 709) that falsely claimed defendant VER had gifted 25,000 bitcoins on November 15, 2011, to his partner;

e.    on June 19, 2017, instructing Employee 1 to "close out" the bitcoin balance, which resulted in the removal of all bitcoins as assets from the financial records of MemoryDealers and Agilestar; and

21

f.   preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed with the IRS on December 18, 2018, a false 2017 U.S. Nonresident Alien Income Tax Return (Form 1040NR) that failed to report income from the distributions of bitcoins to defendant VER from MemoryDealers and Agilestar.

COUNT FIVE

[26 U.S.C. § 7201]

31.  The Grand Jury realleges paragraphs 1 through 25 and 27 of this Indictment here.

32.  From on or about January 1, 2017, through on or about December 18, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant VER willfully attempted to evade and defeat income tax due and owing by him to the United States of America, for the calendar year 2017, by committing the following affirmative acts, among others, on or about the following dates:

a.   on June 19, 2017, instructing Employee 1 to "close out" the bitcoin balance, which resulted in the removal of all bitcoins as assets from the financial records of MemoryDealers and Agilestar;

b.   on July 26, 2018, falsely stating to Return Preparer 1 that he did not receive any distributions or other payments from MemoryDealers in 2017;

c.   on July 26, 2018, falsely stating to Return Preparer 1 that he did not receive any distributions or other payments from Agilestar in 2017; and

d.   preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed with the IRS

22

on December 18, 2018, a false 2017 U.S. Nonresident Alien Income Tax Return (Form 1040NR) that failed to report income from the distributions of bitcoins to defendant VER from MemoryDealers and Agilestar.

COUNT SIX

[26 U.S.C. § 7206(1)]

33.   The Grand Jury realleges paragraphs 1 through 25 and 27 of this Indictment here.

34.   On or about May 10, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant VER willfully made and subscribed, and filed and caused to be filed with the IRS, a false 2014 U.S. Nonresident Alien Income Tax Return (Form 1040NR), which was verified by a written declaration that it was made under penalties of perjury and which defendant VER did not believe to be true and correct as to every material matter. The Form 1040NR was not true and correct as follows:

a.   on the Sales and Other Dispositions of Capital Assets (Form 8849), included with the Form 1040NR, defendant VER:

i.   failed to report gain from the constructive sale of personally owned bitcoins, whereas defendant VER then knew he personally owned bitcoins and was required to report gain from their constructive sales;

ii.   falsely reported proceeds of $2,250,000 and gain of $2,064,268 from the constructive sale of MemoryDealers, whereas defendant VER then knew the proceeds and gain from the constructive sale of this company were substantially greater than the amounts he reported; and

1         iii. falsely reported proceeds of $4,310,000 and gain

2 of $3,954,220 from the constructive sale of Agilestar, whereas

3 defendant VER then knew the proceeds and gain from the constructive

4 sale of this company were substantially greater than the amounts he

5 reported;

6       b.   on Line 14, Cap Gain or (Loss), defendant VER falsely

7 reported capital gain of $6,085,116, whereas defendant VER then knew

8 the amount of capital gain he was required to report was

9 substantially greater than this amount; and

10       c.   on Line 75, Amount you owe, defendant VER falsely

11 reported $1,034,357, whereas defendant VER then knew that he owed

12 substantially more than this amount.

13                       COUNT SEVEN

14                [26 U.S.C. § 7206(1)]

15    35.   The Grand Jury realleges paragraphs 1 through 25 and 27 of

16 this Indictment here.

17    36.   On or about May 10, 2016, in Los Angeles County, within the

18 Central District of California, and elsewhere, defendant VER

19 willfully made and subscribed, and filed and caused to be filed with

20 the IRS, a false 2014 Initial and Annual Expatriation Statement (Form

21 8854), which was verified by a written declaration that it was made

22 under penalties of perjury and which defendant VER did not believe to

23 be true and correct as to every material matter. The Form 8854 was

24 not true and correct as follows:

25       a.   defendant VER falsely reported on Part IV, Section A,

26 Line 2 that his net worth was $18,669,174.42, whereas he then knew

27 his net worth was substantially greater than this amount;

28

b.   defendant VER failed to report on Part IV, Section B, Line 8 and attachment that he personally owned any bitcoins, whereas he then knew he personally owned bitcoins;

c.   defendant VER failed to report on Part IV, Section B, Line 8 and attachment that he had an account at Coinbase that held bitcoins, whereas he then knew he had an account at Coinbase that held bitcoins;

d.   defendant VER falsely reported on Part IV, Section B, Line 8 and attachment the fair market value of MemoryDealers as $2,250,000, whereas he then knew the fair market value of the company was substantially greater than this amount; and

e.   defendant VER falsely reported on Part IV, Section B, Line 8 and attachment the fair market value of Agilestar as $4,310,000, whereas he then knew the fair market value of the company was substantially greater than this amount.

COUNT EIGHT

[26 U.S.C. § 7206(1)]

37.   The Grand Jury realleges paragraphs 1 through 25 and 27 of this Indictment here.

38.   On or about December 18, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant VER willfully made and subscribed, and filed and caused to be filed with the IRS, a false 2017 U.S. Nonresident Alien Income Tax Return (Form 1040NR), which was verified by a written declaration that it was made under penalties of perjury and which defendant VER did not believe to be true and correct as to every material matter. The Form 1040NR was not true and correct as follows:

1         a.   on Line 61, total tax, defendant VER falsely reported

2 $583,281, whereas he then knew that his total tax was substantially

3 more than this amount because it did not include any tax from the

4 distributions of bitcoins from MemoryDealers and Agilestar he

5 received that year; and

6         b.   on Line 75, Amount you owe, defendant VER falsely

7 reported $333,025, whereas defendant VER then knew that he owed

8 substantially more than this amount.

9                          A TRUE BILL

10

11                     /s/

12                     Foreperson

13 E. MARTIN ESTRADA
United States Attorney

14

15

16 MACK E. JENKINS
Assistant United States Attorney

17 Chief, Criminal Division

18 RANEE A. KATZENSTEIN
Assistant United States Attorney

19 Chief, Major Frauds Section

20 MATTHEW J. KLUGE
Assistant Chief, Tax Division

21 United States Department of Justice

22 PETER J. ANTHONY
Trial Attorney, Tax Division

23 United States Department of Justice

24 JAMES C. HUGHES
Assistant United States Attorney

25 Major Frauds Section

26

27

28