Ashwin J. Ram (SBN: 277513)
aram@steptoe.com
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
+1 213 439 9400

Andrew C. Adams (*pro hac vice* motion forthcoming)
acadams@steptoe.com
1114 6th Ave.
New York, NY 10036
+1 212 506 3900

Nicholas P. Silverman (*pro hac vice* motion forthcoming)
nsilverman@steptoe.com
Galen C. Kast (*pro hac vice* motion forthcoming)
gkast@steptoe.com
1330 Connecticut Ave. NW
Washington, DC 20036
**Steptoe LLP**

Darrell P. White (SBN: 270038)
dwhite@klw-law.com
17631 Fitch
Irvine, CA 92614
+1 949 474 0940
**Kimura London & White LLP**

*Attorneys for Defendant Roger Keith Ver*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ROGER K. VER,<br><br>Defendant. | Case No.: 2:24-cr-00103-MWF<br><br>**DEFENDANT ROGER K. VER'S NOTICE OF MOTION TO DISMISS COUNTS ONE THROUGH EIGHT OF THE INDICTMENT**<br><br>Judge: Hon. Michael W. Fitzgerald<br>Hearing Date: February 3, 2025<br>Time: 1:30 pm<br>Date Filed: December 3, 2024 |

DEFENDANT ROGER K. VER'S MOTION TO DISMISS

CASE NO. 2: 24-CR-00103-MWF

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that, February 3, 2025, or as soon thereafter as the matter may be heard by the Honorable Michael W. Fitzgerald, in the United States District Court for the Central District of California located at 350 W. First Street, Los Angeles, CA 90012, Courtroom 5A, Defendant Roger K. Ver ("Ver"), by and through undersigned counsel, will and hereby do respectfully move this Court to dismiss the indictment with prejudice.

This Motion is made on the grounds that federal district courts have the inherent discretion to allow a foreign defendant not present in the United States to make a special appearance for the limited purpose of moving to dismiss an indictment. This Motion is further made following the conference of counsel pursuant to L.R. 7-3, which took place via email on November 21, November 25, November 26, and December 2, 2024. The government requested a response date of January 6, 2024, and the parties will provide a joint schedule for briefing on the motion.

This motion is based on this notice, the accompanying memorandum of points and authorities, any reply that Ver may make, such other evidence and arguments as may be presented at or prior to the hearing, and all records and files in this action.

*[Signature page to follow]*

1

DEFENDANT ROGER K. VER'S MOTION TO DISMISS

CASE NO. 2: 24-CR-00103-MWF

Dated: December 3, 2024                    Respectfully submitted,


                                           */s/ Ashwin J. Ram*
                                           Ashwin J. Ram (SBN: 277513)
                                           aram@steptoe.com
                                           633 West Fifth Street, Suite 1900
                                           Los Angeles, CA 90071
                                           +1 213 439 9400

                                           Andrew C. Adams (*pro hac vice* motion forthcoming)
                                           acadams@steptoe.com
                                           1114 6th Ave.
                                           New York, NY 10036
                                           +1 212 506 3900

                                           Nicholas P. Silverman (*pro hac vice* motion forthcoming)
                                           nsilverman@steptoe.com
                                           Galen C. Kast (*pro hac vice* motion forthcoming)
                                           gkast@steptoe.com
                                           1330 Connecticut Ave. NW
                                           Washington, DC 20036
                                           **Steptoe LLP**

                                           Darrell P. White (SBN: 270038)
                                           dwhite@klw-law.com
                                           17631 Fitch
                                           Irvine, CA 92614
                                           +1 949 474 0940
                                           **Kimura London & White LLP**

                                           *Attorneys for Defendant Roger Keith Ver*

DEFENDANT ROGER K. VER'S MOTION TO DISMISS

CASE NO. 2: 24-CR-00103-MWF

Ashwin J. Ram (SBN: 277513)
aram@steptoe.com
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
+1 213 439 9400

Andrew C. Adams (*pro hac vice* motion forthcoming)
acadams@steptoe.com
1114 6th Ave.
New York, NY 10036
+1 212 506 3900

Nicholas P. Silverman (*pro hac vice* motion forthcoming)
nsilverman@steptoe.com
Galen C. Kast (*pro hac vice* motion forthcoming)
gkast@steptoe.com
1330 Connecticut Ave. NW
Washington, DC 20036
**Steptoe LLP**

Darrell P. White (SBN: 270038)
dwhite@klw-law.com
17631 Fitch
Irvine, CA 92614
+1 949 474 0940
**Kimura London & White LLP**

*Attorneys for Defendant Roger Keith Ver*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> ROGER K. VER, <br><br> Defendant. | Case No.: 2:24-cr-00103-MWF <br><br> **DEFENDANT ROGER K. VER'S MOTION TO DISMISS COUNTS ONE THROUGH EIGHT OF THE INDICTMENT** <br><br> Judge: Hon. Michael W. Fitzgerald <br> Hearing Date: February 3, 2025 <br> Time: 1:30 p.m. <br> Date Filed: December 3, 2024 |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................1

II.   BACKGROUND ................................................................................................2

   A.  Ver's Decision to Expatriate and Reliance on Respected Counsel .............4

   B.  Ver's Good Faith Efforts in the Face of Uncertain Tax Laws.....................5

      1)  Professional Advice in 2017 .................................................................9

      2)  The Government Violates Attorney-Client Privilege and Its Own
         Policies ...............................................................................................11

      3)  The Indictment and Ver's Arrest in Spain .........................................12

III.  ARGUMENT ...................................................................................................13

   A.  The Exit Tax Violates the Constitution ...................................................13

      1)  The Exit Tax is Unapportioned ...........................................................14

      2)  The Exit Tax is Direct .........................................................................14

      3)  The Exit Tax Is Not Excepted by the Sixteenth Amendment.............14

      4)  The Exit Tax Is an Unconstitutional Infringement on the Right to
         Expatriate............................................................................................17

   B.  The Indictment Rests on Impermissibly Vague Statutory Foundations.....19

      1)  Bitcoin's Regulatory Uncertainty and the Tax Code's Vague
         Provisions ...........................................................................................19

         1. Foreign Currency.........................................................................22

         2. Non-Currency Capital Assets.......................................................24

         3. Financial Instruments ..................................................................25

      2)  Notice 2014-21 Warrants No Deference and Does Not Remedy the
         Tax Code's Vagueness........................................................................25

      3)  The Indictment Charges an Impermissibly Vague "Offense" ............27

   C.  The Government's Selective Quotation and Disregard of Exculpatory
     Evidence Warrants Dismissal ...................................................................28

IV.  CONCLUSION ................................................................................................32

1

# TABLE OF AUTHORTIES

2

**Page(s)**

3

**Cases**

4

*AMP Inc. v. United States,*

5

185 F.3d 1333 (Fed. Cir. 1999) ............................................................23

6

*Aptheker v. Sec'y of State,*

7

378 U.S. 500 (1964).............................................................................17

8

*Bromley v. McCaughn,*

9

280 U.S. 124 (1929).............................................................................14

10

*Bullock v. Carter,*

11

405 U.S. 134 (1972).............................................................................18

12

*Burdick v. Takushi,*

504 U.S. 428 (1992).............................................................................17

13

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*

14

467 U.S. 837 (1984), *overruled by Loper Bright Enters. v.*

15

*Raimondo,* 144 S. Ct. 2244 (2024) ................................................26, 27

16

*City of Chicago v. Morales,*

17

527 U.S. 41 (1999)...............................................................................20

18

*Edwards v. Cuba R. Co.,*

19

268 U.S. 628 (1925).............................................................................14

20

*Eisner v. Macomber,*

21

252 U.S. 189 (1920).............................................................................15

22

*Fernandez v. Weiner,*

23

326 U.S. 340 (1945).............................................................................14

24

*Helvering v. Griffiths,*

25

318 U.S. 371 (1943).............................................................................16

26

*Helvering v. Horst,*

27

311 U.S. 112 (1940).............................................................................16

28

*Hill v. Colorado*,
    530 U.S. 703 (2000)..........................................................................20

*Kolender v. Lawson*,
    461 U.S. 352 (1983)..........................................................................20

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024)...........................................................19, 26, 27

*Maehr v. U.S. Dep't of State*,
    5 F.4th 1100 (10th Cir. 2021) .........................................................17

*Mayo Found. v. United States*,
    562 U.S. 44 (2010)............................................................................27

*Moore v. United States*,
    144 S. Ct. 1680 (2024).............................................................15, 16

*Murray v. The Charming Betsy*,
    6 U.S. 64 (1804)................................................................................17

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)..........................................................................13

*Perlin v. Commissioner*,
    86 T.C. 388 (1986)............................................................................24

*Quijano v. United States*,
    93 F.3d 26 (1st Cir. 1996).................................................................16

*Richards v. Sec'y of State*,
    752 F.2d 1413 (9th Cir. 1985) ..........................................................16

*Savorgnan v. United States*,
    338 U.S. 491 (1950)..........................................................................17

*Shapiro v. Thompson*,
    394 U.S. 618 (1969)..........................................................................18

*Taft v. Bowers*,
    278 U.S. 470 (1929)..........................................................................14

iii

1
2

*United States v. Al Mudarris*,
    695 F.2d 1182 (9th Cir. 1983) ........................................................28

3
4

*United States v. Bescond*,
    24 F.4th 759 (2d Cir. 2021) ...........................................................13

5
6

*United States v. Davis*,
    588 U.S. 445 (2019)............................................................19, 20, 27

7
8

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)........................................................................17

9
10

*Wyoming Gun Owners v. Gray*,
    83 F.4th 1224 (10th Cir. 2023) .....................................................20

11
12

**Statutes**

13

26 C.F.R. § 1.1012-1(c) ......................................................................24

14

18 U.S.C. § 1341 .................................................................................27

15

19 U.S.C. § 2432(a) ............................................................................18

16
17

26 U.S.C. § 1 .......................................................................................22

18

26 U.S.C. § 351(e) ..............................................................................23

19

26 U.S.C. § 721(b) ..............................................................................23

20

26 U.S.C. § 877A(a)(1) .......................................................................13

21
22

26 U.S.C. § 877A(a)(2)(A) ..................................................................13

23

26 U.S.C. § 985(b) ..............................................................................23

24

26 U.S.C. § 987 ...................................................................................23

25

26 U.S.C. § 988(a) ..............................................................................22

26

26 U.S.C. § 988(e) ..............................................................................23

27
28

26 U.S.C. § 1012 .................................................................................25

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

26 U.S.C. § 1211(b) ..................................................................22

26 U.S.C. § 1212(b) ..................................................................22

26 U.S.C. § 1221 ......................................................................24

26 U.S.C. § 1222 ......................................................................25

26 U.S.C. § 1256 ......................................................................23

**Other Authorities**

Edward D. Kleinbard, *Equity Derivative Products: Financial
    Innovation's Newest Challenge to the Tax System*, 69 TEX. L. REV.
    1319, 1320 (1991) ...............................................................21

Government Accountability Office, "Virtual Economies and
    Currencies: Additional IRS Guidance Could Reduce Tax
    Compliance Risks," GAO-13-516 (2013),
    https://www.gao.gov/assets/gao-13-516.pdf ......................22

Government Accountability Office, *Virtual Economies and
    Currencies: Additional IRS Guidance Could Reduce Tax
    Compliance Risks* (2013) .....................................................25

IRS Revenue Ruling 74-218 ......................................................23

Joe Hernandez, *El Salvador Just Became The First Country to Accept
    Bitcoin As Legal Tender* .......................................................26

Restatement of the Law of Foreign Relations § 211 .................18

Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System*
    (2008) ...................................................................................23

Texas Society of Certified Public Accountants, *Comments on Notice
    2014-21 Outlining Application of General Tax Principles to
    Transactions Involving Bitcoin, Other Virtual Currencies* ...............25

U.S. Const. art. I § 9..................................................................13

U.S. Const. amend. V.................................................................28

Universal Declaration of Human Rights, U.N.G.A. Res. 217A (III) .......................18

*Virtual Currency, Tax Notes*, 649, 652 (Nov. 11, 2013) .........................................25

Winklevoss Bitcoin Trust Form S-1 Registration Statement at 68 (July
    1, 2013), *available at*
    https://www.sec.gov/Archives/edgar/data/1579346/000119312513
    279830/d562329ds1.htm#tx562329_16 ...........................................................24

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

## I.    INTRODUCTION

The government's charges against Roger Ver rely on violations of his rights; misleading, selective quotations of communications presented to the grand jury; and, fundamentally, on the false and anachronistic pretense that U.S. tax rules provided meaningful guidance to those who, like Ver, were among the pioneers in the now-mainstream cryptocurrency economy. Having ambushed Ver's tax counsel and subjected him to interrogation, the government collected reams of data and communications from Ver's attorneys.

Following that collection, Ver and his prior counsel engaged in good-faith discussions *for years* with the Department of Justice in order to understand their theories of Ver's supposed "offenses," and to identify the amount of past-due tax that Ver supposedly owed. In the midst of those conversations, the government secretly indicted Ver while continuing to feign an interest in the conversations that Ver had initiated years before. Remarkably, neither during those conversations nor in the government's secretly returned indictment has the government even attempted to explain the amount of tax that Ver supposedly failed to pay. Unsurprisingly, this broken process resulted in a defective indictment—one that consistently misquotes Ver and his advisors' communications, relies on unconstitutional extensions of the government's taxing power, and ultimately hangs on a semblance of regulatory clarity that never existed.

The indictment against Roger Ver must be dismissed for two reasons. First, the charges in the indictment are unconstitutional. The "exit tax" at issue violates both the Apportionment Clause and the Due Process Clause of the Constitution. Compounding the Due Process violation presented by the exit tax, the charges also rely on provisions of the U.S. tax laws that were, at all relevant times, inscrutably vague as to their application to digital assets of the kind that underlie the charges. Despite years of negotiation and demands, and despite the government's claim to have attributed cryptocurrency holdings to Ver and his companies, the government

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

has never, and the indictment does not, identify the amount of tax that Ver purportedly owed as the result of his expatriation in 2014—one indication among many of the impermissible vagueness that pervaded U.S. tax law as of the time of Ver's expatriation.

Second, the government persists in its charges, and specifically in the selective quotation and incorporation of certain documents, despite the government's knowledge that the full text of those incorporated documents decimates its claim that Ver acted willfully to violate U.S. tax law, and despite the government's violation of Ver's attorney-client privilege. That selective omission, once remedied by reference to the full text of the documents that the government has incorporated into the indictment, creates an irreconcilable contradiction in the government's allegations that destroy its allegations of required criminal intent. The government's trampling on Ver's attorney-client privilege in the course of its investigation, together with the inexplicable decision to persist in prosecuting the indictment despite the government's awareness of its misleading and incomplete recitation of key facts, reflect a disregard of due process warranting immediate dismissal.

## II.    BACKGROUND

Roger Ver was among the bitcoin ("BTC") pioneers. BTC launched in 2009, and in 2011, Ver and companies affiliated with him began acquiring and promoting its use as an alternative form of currency. While today BTC has increased in value and popularity, at that time the mainstream perception of BTC was as a technology with an uncertain future and little, if any, long-term value. Ver and a relatively small group of peers, however, viewed BTC as a promising medium of exchange—a currency—that would inevitably gain in acceptance and, therefore, utility. Having acquired BTC as part of his personal wealth and his companies' corporate treasuries, and having grappled with accounting for those holdings under principles of unclear application in the digital asset space, Ver was also among the first people to face the vagaries of taxes related to BTC.

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

Ver's approach in the face of that lack of clarity was, then as now, to insist on compliance, good-faith collaboration, and staying within the bounds of U.S. tax law—a difficult task at the time, and one that the government recasts in hindsight as an attempt at evasion (notwithstanding the government's inability to articulate the correct accounting and tax treatment owed to BTC holdings at the times relevant to this indictment). At a time when tens of thousands of BTC owners did not disclose *any* of their BTC holdings or try to pay taxes on those holdings,[1] Ver hired a team of experts including multiple law firms and an experienced appraiser. Ver did this because he "ha[d] no idea what the IRS w[ould] be demanding of [him]," was "very concerned about the proper way to handle [his and his companies'] bitcoin holdings," and "want[ed] to make sure that [his] exit tax payments [we]re as clean as possible," "with no room" for future dispute with the IRS. *See* Ex. 1 (quoted, in part, in Ind. ¶ 27.c).[2]

---

[1] *See* IRS Press Release, *IRS Has Begun Sending Letters to Virtual Currency Owners Advising Them to Pay Back Taxes, File Amended Returns* (July 26, 2019). In 2019, the IRS began sending letters to taxpayers who had not reported their BTC or other virtual currency transactions during the 2013-2017 period (suggesting amnesty for the pre-2013 period during which most of Ver's BTC accrued). The letters provided the taxpayers with the opportunity to correct past mistakes including "incorrectly calculating your income, gain, or loss" in virtual currency by submitting an amended return. Although Ver actually made a good-faith attempt to report his virtual currency transactions, he was not afforded the same due process afforded to every other taxpayer. Instead, Ver was prosecuted.

[2] As discussed in more detail below, the indictment relies on selective quotations, selective omissions, and the presentation of information divorced from context. The government's presentation of that document, and its continued persistence in its prosecution, raise significant due process issues warranting dismissal. Because the indictment incorporates these documents by quotation or reference, we include them here to provide the Court with greater context.

### A.    Ver's Decision to Expatriate and Reliance on Respected Counsel

In 2006, Ver left the United States and moved to Japan, where his future wife had been born and where the two would live in the coming years. In the subsequent years, he rarely returned to the United States and began considering expatriation.

Bitcoin launched in 2009. In 2011, Ver and his companies began acquiring and promoting the use of BTC as an alternative form of currency. While we know today that BTC substantially increased in value over time, at that time, the mainstream perception was that the nascent cryptocurrency was speculative and held an uncertain future. Importantly, and as discussed in more detail below, there were no rules, no guidance, and no best practices for BTC accounting or tax treatment in these early days. The IRS had not yet released guidance, and experts had not coalesced around any particular practices.[3] In light of this absence of formal guidance, and Ver's inexperience with accounting- and tax-related practices, he relied heavily on the professionals he retained to assist him in all accounting- and tax-related matters, including the proper accounting and tax treatment of BTC held by Ver and his companies.

In 2012, Ver retained attorneys at a highly regarded, tax-focused law firm (referred to in the indictment as "Law Firm 1") to advise and assist him with his formal expatriation. To ensure a lawful and final exit from the United States, Ver wanted to ensure that his expatriation taxes were done correctly, and Law Firm 1, which advertised itself as being comprised of experts on tax expatriation law, was hired for that purpose. As he did previously with his accounting professionals, Ver relied heavily on Law Firm 1 to properly advise him on his expatriation taxes. Ver repeatedly told his advisors that he knew that he would be audited, and he wanted

---

[3] The IRS's first guidance on the tax treatment of cryptocurrency, IRS guidance 2014-21, was released on March 25, 2014, three weeks after Ver expatriated.

"to make sure that [his] exit tax payments are as clean as possible, with no room to have trouble from the IRS in the future." *See* Ex. 1 (quoted, in part, in Ind. ¶ 27.c).

### B.    Ver's Good Faith Efforts in the Face of Uncertain Tax Laws

The core issue facing Ver and his advisors was how to value his and his affiliated entities' BTC holdings. As Ver's advisors explained, expatriating citizens are required to "pretend [they] sell everything on the day before [they] terminate [their] citizenship, [March 2, 2014], at fair market value." Ex. 2 (cited in Ind. ¶ 27.a). If that value surpasses a statutory threshold, the unrealized gains from this one-day hypothetical sale are subject to tax.

Calculating the hypothetical, unrealized gains from the hypothetical sale of Ver's BTC holdings as of March 2, 2014 presented an unanswerable question. With the markets that exist in November 2024, the sudden sale of tens of thousands of BTC would cause the price of BTC to tumble, but it would be *possible*. On March 2, 2014, however, such a sale was likely *impossible* as a technological matter and catastrophic as a matter of market value. At the time, BTC was a thinly-traded market with a limited number of active traders. The *only* large marketplace for BTC (a forum called "Mt. Gox") collapsed in early 2014, declaring bankruptcy and going offline in February 2014. By March 2, 2014, any attempt to sell a large block of BTC would have collapsed the market. The value of Ver's BTC would be the amount that could have been sold before that market collapse, but that was impossible to calculate or precisely predict.

Ver's advisors confirmed that it was necessary to consider the lack of sustained demand for BTC and discount any valuation accordingly. While the indictment claims that Lawyer 1 "told defendant Ver that they were legally required to use the $800 per bitcoin [spot price] value," that is *not* Lawyer 1's advice in the cited document. Instead, the cited document shows that Lawyer 1 erroneously believed Ver could sell all of the BTC "within a small interval of time and not

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

depress the market"—a scenario that would justify applying the spot price. Ex. 3 (quoted, selectively, in Ind. ¶ 27.e.vi). Once Lawyer 1 understood that liquidating Ver's BTC would have "crash[ed] the price," he conducted additional research. Based on his research, Lawyer 1 concluded that people who owned property that could not be sold "without depressing the market," could "take this effect into consideration and discount the shares." *See* Ex. 4. Instead of using the $800 price, Lawyer 1 advised Ver that he could get an appraisal that rejected the spot price method in favor of a more accurate simulation of what Ver's property would be worth on the open market. *See* Ex. 5 ("I emphasize that you are allowed to do this because of the size of the BTC holding: For small BTC holdings [which would not move the market], you have to use exchange rates."). That is exactly what Ver did.

Law Firm 1 instructed Ver to assign the BTC in the wallets that he and his companies controlled into (1) BTC Ver believed to be owned by his companies, and (2) BTC Ver believed to be owned by himself personally—excluding BTC in those wallets that were owned by others. Ver followed expert advice with respect to each of these categories. In reality, all of the BTC were maintained in a group of wallets without a coin-by-coin designation of ownership, basis, or other data that might be kept for a capital asset (as opposed to a currency). Ver repeatedly informed his advisors that he could not unscramble the egg to figure out which BTC "belonged" to which entity, as opposed to the amount of money used to acquire BTC for or through a given company. *See*, *e.g.*, Ex. 6 (referenced in Ind. ¶ 27.e.iv) ("There is also a lot of uncertainty about which bitcoin belongs to myself vs MemoryDealers."). In a display of good faith, Ver volunteered to take the most conservative (and personally expensive) approach: assign it all to himself personally, requiring payment of both transfer taxes and exit taxes. *See, e.g.*, *id*. ("For tax purposes, I suspect we should assign just about all of it to myself?"); Ex. 7(quoted in Ind. ¶ 27.e.vii). However, Ver's idea was rejected in favor of allocating BTC among companies and conducting corporate appraisals—a task now painted as criminal

notwithstanding the complete lack of regulatory clarity for crypto accounting and reporting, and notwithstanding his professionals 'advice.

The BTC owned by Ver's companies—MemoryDealers U.S. and Agilestar—were included as assets of those companies and incorporated into the appraisal of those companies conducted by Appraiser 2. Ver's accountants provided Appraiser 2 with "the companies' financial records," which listed BTC purchases in the ordinary course, and Appraiser 2 used those financial records, tax returns, other documents, and his expertise to prepare valuations that included BTC valued at approximately $1.4 million, making the combined value of the two businesses approximately $6.6 million. Ind. ¶ 27.x. Appraiser 2 rejected any valuation of Ver's companies based on the spot price of their assets and instead appraised them using a complex analysis that he explained in a lengthy report. Although the indictment claims that Ver's May 4, 2016 Initial and Annual Expatriation Statement (Form 8854) for tax year 2014 "underreported the fair market values of MemoryDealers and Agilestar," Ind. ¶ 27.g, none of the lawyers who reviewed the appraiser's report objected or warned Ver that the valuation was too low. As discussed in more detail below, this approach to accounting and reporting BTC was perfectly reasonable given the lack of statutory clarity around the tax treatment of digital assets that persists to this day.

Based on Lawyer 1's advice to obtain an appraisal of BTC that accounted for the effect of selling those BTC all at once, Ver approached Appraiser 2 to appraise BTC that were not assigned to his U.S. companies. Ind. ¶ 27.e.xviii (quoting Ex. 8). He emphasized that this would require appraising the value of BTC "in an illiquid market," because that is what existed in early 2014. Ind. ¶ 27.e.xviii (quoting Ex. 8). As they discussed, "[t]he market at that time was very very thin, and any substantial sale of bitcoins would easily crash the price," and any valuation would depend in

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

part on "trading volume volatility." Ex. 8 (quoted in Ind. ¶ 27.e.xxiii). Appraiser 2 therefore began preparing a valuation of the BTC in question.[4]

That valuation process was short-circuited when Ver's lawyers learned that the BTC not accounted for in the valuation of Ver's U.S. companies were, in fact, owned for tax purposes by MemoryDealers Japan, an affiliate of MemoryDealers U.S. owned by Ver's romantic partner, a Japanese citizen and resident. Ver's lawyers contemplated the potential entity ownership of Ver's BTC before consulting with Ver regarding that potential approach. *See* Ex. 10 (cited in Ind. ¶ 27.e.xxvii) (noting that Lawyer 1 would look into "the exactness of [Ver's] holdings whether personal or entity"). As one attorney later explained, the lawyers concluded that the BTC were owned by MemoryDealers Japan because they were traded using MemoryDealers Japan's bank account, and Roger's partner was the sole shareholder of MemoryDealers Japan. *See* Ex. 11 (cited in Ind. ¶ 27.e.xxviii). That attorney explained that although the funds originated from Ver, Ver "made one or more gifts of BTC to [his] partner," which "were subject to US gift tax" but not exit tax, and any subsequent trades were executed within Ver's role as an agent of MemoryDealers. *Id.* Ver's lawyers agreed to consider "whether we can still take this position" in light of Ver's personal understanding that the coins had been his. *Id.* The lawyers—not Ver—determined that Ver's actions legally "gave the BTC wallet to [his partner]," and that they would "report[] [it] as a gift." Ex. 12. After discussions with counsel, Ver thereafter filed a tax return memorializing what his counsel told him had occurred under the rules of the tax code: his provision of the wallet's passcode and use of MemoryDealers Japan's account to trade constituted a gift of the resulting BTC to the owner of MemoryDealers Japan. Ind. ¶ 27.e.xxix.

---

[4] Ver estimated that he "h[e]ld personally" 25,000 BTC after excluding the value of BTC that he may have held custodially for others. Ex. 9 (quoted in Ind. ¶ 27.e.xxvi).

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

Because Ver's lawyers advised him that he did not need to pay taxes on MemoryDealers Japan's property and advised him that the BTC Ver considered personal were in fact MemoryDealers Japan's property, those BTC were not listed on the May 4, 2016 U.S. Nonresident Alien Tax Return (Form 1040NR) for tax year 2014. Ind. ¶ 27.f.

### 1) Professional Advice in 2017

The government's charges involving Ver's filing of his 2017 taxes are similarly unfounded, as the government now knows. The indictment's 2017 allegations are directly contrary to the real-time advice provided to Ver by his legal and accounting professionals. The government has alleged that Ver intentionally failed to report capital gains that accrued when MemoryDealers U.S. and Agilestar shut down in 2017 and their assets were transferred to Ver. Whereas the 2014 allegations attack Ver for not recording sufficient BTC as his personal property, the 2017 allegations attack him for not recording the same BTC as corporate property subject to taxation upon transfer.

Regardless of this contradiction, the indictment's 2017 allegations are fatally flawed and are based on facts that the government now knows to be false. In 2016, Ver was again advised by Law Firm 1, which explained to Ver that gains on the sale of MemoryDealers U.S. and Agilestar would not be subject to federal tax because, in general, capital gains are not taxable to non-residents like Ver, who had by then expatriated.[5] With this backdrop, two events occurred in 2017. First, in June 2017, Ver was in the process of winding down his U.S. businesses, and asked Employee 1 to close out the MemoryDealers books, which at that time reported less than $10,000 in assets. Second, later that year, Ver sold some of his BTC. Accurately or inaccurately, Ver believed based upon discussions with counsel that he would not

---

[5] *See* Ex. 13.

9

owe capital gains taxes upon the sale of his BTC assets following expatriation because his U.S. tax obligations on pre-expatriation assets had concluded upon his payment of expatriation taxes.

In 2018, in preparation for Ver's 2017 taxes, Return Preparer 1 asked Ver to confirm that he had not received any distributions or other payments from MemoryDealers or Agilestar.[6] In light of the fact that Employee 1 had not issued Ver a 1099-DIV for 2017, and Ver's belief that he did not need to pay taxes upon the sale of his pre-existing BTC assets post-expatriation, he confirmed that no distributions had been made in 2017. Nonetheless, in the same email, in response to Return Preparer 1's request that he confirm that he had "no cryptocurrency transactions on U.S. exchanges in 2017," Ver corrected Return Preparer 1's mistaken understanding and explained that that he had made "substantial trades" on U.S.-based crypto currency exchanges, and asked Law Firm 1 what needed to be done about those trades. Two weeks later, Return Preparer 1 responded to Ver's question on whether he owed U.S. taxes on his 2017 BTC trades. Return Preparer 1 advised Ver that his trades on the U.S. exchanges were not taxable to him because Ver was a nonresident, and U.S. sales of intangible personal property are sourced to the residence of the seller. *See* Ex. 14. Return Preparer 1 also advised Ver it would not need any further detail about those transactions. *See id*.

The context for Ver's 2017 filing was previously reflected in privileged communications, which have previously been provided to the government and, now, to the Court. Despite a prior disclosure of this evidence that fatally undermines the

---

[6] *See* Ex. 14. (cited in Ind. ¶ 27.i.vii.)

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

government's claim of intentional misconduct, the government has persisted in prosecuting Ver for conduct it now knows, definitively, not to have been criminal.[7]

### 2)  The Government Violates Attorney-Client Privilege and Its Own Policies

Ver first learned of the Department's investigation in December 2017, after Special Agents with the IRS Criminal Investigation Division appeared at the law office of Ver's tax counsel and conducted an unannounced interview of one of Ver's attorneys. When another of Ver's attorneys intervened and ended the interview, the Special Agents served the law firm and two of its employees with grand jury subpoenas. Department policy requires significant scrutiny by Department supervisors and safeguards against abuse prior to the questioning of a subject's attorney or the service of compelled process on an attorney. Justice Manual § 9-13.410. An unannounced interrogation by on-duty, armed, federal agents immediately prior to the service of compelled process strongly suggests that this investigative step fell outside of Department policy or supervisory approval. Unsurprisingly, this "technique" has resulted in the collection of privileged material that remains subject to litigation.[8]

---

[7] Through this limited waiver of Ver's privilege regarding his 2017 filing, Ver does not, and does not intend, to waive privilege as to other confidential communications.

[8] Should Ver be required to appear, he intends to move to dismiss based on the use and derivative use of information coerced through the agents' unlawful interview of Ver's lawyer. Because such a motion will likely require an evidentiary hearing at which Ver would have a right to be present, such a motion must be delayed until after the Spanish courts rule on the government's extradition request. By citing to the documents that the government has already used to seek its indictment, Ver does not waive or forgo any such motion or the underlying privilege related to the legal advice Ver received in connection with the process of expatriating and filing his 2014 tax returns.

### 3)    The Indictment and Ver's Arrest in Spain

Although Ver had long engaged the government in discussions regarding a civil resolution of this matter, the government has *never* been able to articulate the taxes purportedly owed by Ver. Instead of continuing those discussions in good faith, but while Ver's prior counsel remained under the impression that discussions were ongoing, on February 15, 2024, the government announced that Ver had been charged in an eight-count indictment. Ver was in Spain at that time—he had never fled from criminal charges; he was and is in no sense a "fugitive."

Compounding the many problems in this case, and particularly the government's continued insistence on prosecution despite its awareness that the indictment is grounded in significant part on selective summary and quotation of otherwise exculpatory communications, the government has enlisted the Spanish courts in pursuit of his extradition. After arguing (unsuccessfully) for his detention in Spain, the government—again, having been informed expressly of the errors in their indictment—transmitted that document through the U.S. and Spanish Central Authorities for the purpose of seeking extradition, which remains pending.

Most egregiously, the government's extradition "package" submitted to the Spanish authorities on August 19, 2024 included the original indictment, including the baseless claim that Ver withheld information from his accountants regarding his 2017 tax filings *despite the government having reviewed the full communication between Ver and his accountants revealing the indisputable falsity of that allegation provided to the government by Ver on July 18, 2024.* Notwithstanding the government's possession of that exculpatory information, it further permitted the Spanish prosecutor to reiterate the same false claims to the Spanish court on October 24, 2024, and sought—and continues to seek—an illegal extradition of Ver based in part on allegations it knows to be untrue.

## III.   ARGUMENT

The indictment must be dismissed. The charges are unconstitutional: they rely on a tax that is itself a violation of both the Sixteenth Amendment and the Due Process Clause of the Fifth Amendment; they rely on impermissibly vague laws that, at all relevant times, provided no basis for a person of reasonable intelligence to understand the proper application of tax laws to digital currencies; and they rely on the government's persistent trampling on basic rights and notions of fair play.[9]

### A.   The Exit Tax Violates the Constitution

The exit tax obligates a covered expatriate to pretend that they "sold" "[a]ll [of their personal and real] property … on the day before the expatriation date for its fair market value." 26 U.S.C. § 877A(a)(1). The covered expatriate is then taxed on the imaginary gain from that pretend sale as though that gain had in fact been realized. 26 U.S.C. § 877A(a)(2)(A).

"[T]axes on personal property [are] direct taxes" that "must be apportioned among the several States" under U.S. Const. art. I § 9. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 571 (2012) (citing *Eisner v. Macomber*, 252 U.S. 189 (1920)). The Sixteenth Amendment creates a limited exception for direct taxes on incomes derived from any source. That exception does not apply to the exit tax. The exit tax is unapportioned, direct, and not exempted by the Sixteenth Amendment. The tax, moreover, presents an unjustified burden on the fundamental right to expatriate. For all of these reasons, the exit tax is unconstitutional.

---

[9] The government may oppose this motion by relying on a situation of the government's own making, namely Ver's presence in Spain at the time of his sudden arrest. However, the "fugitive disentitlement" doctrine does not apply to Ver for purposes of this motion. Ver is neither a fugitive nor subject to disentitlement. *See United States v. Bescond*, 24 F.4th 759 (2d Cir. 2021). Ver, a foreign citizen, was living abroad long before the offenses in this matter arose, and was actively engaged in negotiations with the government when the government chose to secretly indict Ver and seek his arrest while he was on vacation in Spain.

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

### 1)    The Exit Tax is Unapportioned

Apportionment requires measures ensuring that the tax collected from each state is in proportion to its population. The exit tax does not require such measures, and it is therefore indisputably unapportioned.

### 2)    The Exit Tax is Direct

The exit tax imposes a direct tax because it applies regardless of whether the owner transfers their assets or engages in any other particular use or enjoyment of the assets. Direct taxes are those that are "levied upon or collected from persons because of their general ownership of property [and] which fall[] upon the owner merely because he is owner, regardless of the use or disposition made of his property." *Bromley v. McCaughn*, 280 U.S. 124, 136-38 (1929). A tax levied upon property in all of its uses is direct, whereas an indirect tax is imposed "upon a particular use or enjoyment of property or the shifting from one to another or any power or privilege incidental to the ownership or enjoyment of property." *Compare id.* at 137, *with Fernandez v. Weiner*, 326 U.S. 340, 352 (1945).

The exit tax applies to "the increase in value of assets that continue to be held" without any transfer, use, or enjoyment. *See* J. Comm. on Tax'n, 104th Cong., Issues Presented by Proposals to Modify the Tax Treatment of Expatriation, at 69 (1995). While the expatriating individual may be changing locations, the exit tax applies to assets like real property, stock, and allegedly BTC that do not move or undergo any event whatsoever.

### 3)    The Exit Tax Is Not Excepted by the Sixteenth Amendment

For an unapportioned direct tax, like the exit tax, to be constitutional, it must satisfy the Sixteenth Amendment. The Sixteenth Amendment requires proof that the amount being taxed qualifies as "income" to the taxpayer. *Taft v. Bowers*, 278 U.S. 470, 481 (1929); *see also Edwards v. Cuba R. Co.*, 268 U.S. 628, 631 (1925) ("The Sixteenth Amendment, like other laws authorizing or imposing taxes, is to be taken

---

14

as written, and is not to be extended beyond the meaning clearly indicated by the language used."). The constitutionality of the exit tax therefore turns on whether the unrealized increase in value of property is an "income." An unrealized and potentially temporary increase in value is not income, and as a result, the exit tax is unconstitutional.

Unrealized increases in capital asset spot prices are not income. A "gain" does not become income until it is "'derived,' that is, received or drawn by the recipient (the taxpayer) for his *separate* use, benefit and disposal." *Macomber*, 252 U.S. at 207. An "increase in value of capital investment is not income," until it has been "realized or received" in a transaction. *Id.* at 212, 214-15. Because any increase in the spot price of BTC had not been "realized or received," it was not taxable income.

The core rule remains that gains in a capital asset's value are not "income" within the meaning of the Sixteenth Amendment until they are "realized." *Moore v. United States*, 144 S. Ct. 1680, 1701 (2024) (Barrett, Alito, JJ., concurring); *id.* at 1721-22 (Thomas, Gorsuch, JJ., dissenting). Where the owner of a capital asset has "not received a dividend, profit from selling their [asset], or any other pecuniary benefit from their [asset] ownership," that owner has "not [yet] 'derived' income from their [asset] because nothing has come in." *Moore*, 144 S. Ct. at 1702 (Barrett op.); *see also id.* at 1722 (Thomas op.) ("The fact is, property is a tree; income is the fruit." (quoting *Waring v. Mayor and Aldermen of Savannah*, 60 Ga. 93, 100 (1878))). Unrealized appreciation in the value of an asset cannot be taxed as income.

The Ninth Circuit's holding in *Moore*, 36 F.4th 930 (9th Cir. 2022), *aff'd on other grounds*, 144 S. Ct. 1680 (2024) is not to the contrary. 36 F.4th 930 (9th Cir. 2022), *aff'd on other grounds*, 144 S. Ct. 1680 (2024). In *Moore*, the court reviewed the constitutionality of a tax on incomes realized by a foreign corporation but not yet distributed to the corporation's shareholders. The court observed that "[w]hether *the taxpayer* has realized income does not determine whether a tax is constitutional" because income can be taxed even when it has been realized by a corporate entity

and not yet realized by the taxpayer. 36 F.4th at 935-36 (emphasis added).[10] Instead, taxable income can include "attributing a corporation's income pro-rata to its shareholders." *Id.* at 936. Because the corporation had undisputedly recognized income and the taxpayer "ha[d] some ability to control distribution" of that realized income, the income could be taxed. *Id.* at 936-37. *Moore* does not hold that gains that have not been realized by *anyone* can nonetheless be taxed. Such a holding would contradict controlling Supreme Court case law.

Section 877A creates a fictious realization event (*i.e.,* a constructive sale) where none has occurred. Section 877A, by its very operation, is a tax on the unrealized appreciation of property owned by an individual. Because section 877A taxes unrealized appreciation, it is not a tax on "income" within the meaning of the Sixteenth Amendment, and is unconstitutional under Article I's apportionment clause.

---

[10] The court also stated in this paragraph that "the Supreme Court has made clear that realization of income is not a constitutional requirement." *Id.* (citing *Helvering v. Horst*, 311 U.S. 112, 116 (1940); *Helvering v. Griffiths*, 318 U.S. 371, 393-94 (1943)). To the extent this statement addresses instances in which gain has not been realized by anyone, it is dicta. The statement is also incorrect. Both *Horst* and *Griffiths* had no cause to reconsider the realization requirement because both involved cases in which the gains were realized. *See Horst*, 311 U.S. at 115 (holding that gains in interest coupons were taxable to a donor because they were "realiz[ed] … when the last step is taken by which [the taxpayer] obtains the fruition of the economic gain which has already accrued to him") (citations omitted); *Griffiths*, 318 U.S. at 394 (declining to reconsider *Macomber*'s realization requirement because the tax in question did not reach unrealized gains). Since *Horst* and *Griffiths*, "[T]he Supreme Court has described '"income" in its constitutional sense' as 'instances of undeniable accessions to wealth, *clearly realized*, and over which the taxpayers have complete dominion.'" *Quijano v. United States*, 93 F.3d 26, 30 (1st Cir. 1996) (quoting *Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 432 n.11 (1955) (emphasis added)).

---

16

### 4) The Exit Tax Is an Unconstitutional Infringement on the Right to Expatriate

The right to leave the country is fundamental. All Americans have a "constitutional right of voluntary expatriation." *Richards v. Sec'y of State*, 752 F.2d 1413, 1422 (9th Cir. 1985). The constitutional right to expatriate is fundamental because it is "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty …." *See Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotations and citations omitted); *Murray v. The Charming Betsy*, 6 U.S. 64, 93 (1804) ("[E]very man has a right to expatriate himself, is admitted by all the writers upon general law; and it is a principle peculiarly congenial to those upon which our constitutions are founded."); *Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1112 (10th Cir. 2021) (holding that both the right of expatriation and right to travel internationally are "deeply woven into our country's history"). The Supreme Court and Congress have each recognized that the right to leave one's country is "a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness." *Savorgnan v. United States*, 338 U.S. 491, 497 & n.11 (1950) (quoting Preamble to the Act of July 27, 1868, ch. 249, 15 Stat. 223).

Because the right to expatriate is a fundamental right, a substantial restriction on that right is subject to strict scrutiny and may only survive if narrowly tailored to promote a compelling government interest. *See Aptheker v. Sec'y of State*, 378 U.S. 500, 507-08 (1964) (holding that the denial of passports to United States citizens, who were communist party members, was an unconstitutional burden on the fundamental right of international travel).[11] In order "[t]o assure the continued

---

[11] The scrutiny applied to burdens on the right to vote depend on the degree of the burden. Under *Burdick-Anderson* doctrine, "severe" restrictions must be narrowly drawn to advance a state interest of compelling importance. *Burdick v. Takushi*,

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

dedication of the United States to *fundamental human rights*," U.S. law prohibits the government from extending certain trade benefits to certain other countries if they deny their citizens "the right or opportunity to emigrate" or "impose[] more than a nominal tax on emigration." 19 U.S.C. § 2432(a).[12] In light of the standard chosen by Congress as necessary to protect fundamental human rights in other nations, it would be anomalous to conclude that U.S. law can "impose[] more than a nominal tax" on expatriates.

But the current exit tax attempts to do just that: demanding millions of dollars from expatriates in taxation that would not apply to anyone else. The only potential government interest is raising revenue, and there are innumerable less restrictive means through which revenue can be raised. *See Shapiro v. Thompson*, 394 U.S. 618, 633 (1969) (holding that fiscal concerns were insufficient to justify burden on public assistance programs based on exercise of right to interstate migration); *Bullock v. Carter*, 405 U.S. 134, 147 (1972) (holding that the imposition of filing

---

504 U.S. 428, 434 (1992) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). "[R]easonable, nondiscriminatory restrictions" are subject to lower scrutiny. *Id.* To the extent that the *Burdick-Anderson* doctrine applies here, the exit tax imposes a severe burden and is neither "reasonable" nor "nondiscriminatory." The exit tax discriminates against both the wealthy and U.S. origin non-citizens by singling them out for immense tax bills on unrealized gains that do not apply to anyone else. Regardless of the level of scrutiny applied, the exit tax fails.

[12] International law likewise recognizes the fundamental right to expatriate. *See, e.g.*, Universal Declaration of Human Rights, U.N.G.A. Res. 217A (III) (Dec. 10, 1948) (recognizing the universal right to leave one's country and the right to change one's nationality); International Covenant on Civil and Political Rights, U.N.G.A. Res. 2000A (XXI) (Dec. 16, 1966) (prohibiting restrictions on the right to leave one's country except those which are provided by law and necessary to protect national security, public order, public health, morals, or the rights and freedoms of others); Restatement of the Law of Foreign Relations § 211 (recognizing that imposing involuntary nationality on an individual may violate international law).

---

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

fees up to $8,900 were an unconstitutional burden on the right to run for office and interest in financing elections was insufficient). The exit tax is an unconstitutional burden on the fundamental right to expatriate.

## B. The Indictment Rests on Impermissibly Vague Statutory Foundations

The government's charges against Ver rest on an attempt to impart a semblance of "clarity" regarding cryptocurrencies' tax treatment offered by the IRS in March 2014 to activities occurring prior to March 25, 2014. The lack of any rules in effect at that time deprived Ver of notice and rendered the law unconstitutionally vague. Moreover, the purported "clarity" offered by the IRS as to the tax treatment of digital assets as a monolithic category, as issued in its Notice 2014-21 Guidance, a set of Q&A's not subject to notice and comment review, is precisely the type of agency rule interpretation that does violence to the underlying statutory regime that "guidance" purports to interpret. In the wake of the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024), that shaky interpretation warrants no deference and, once set aside, only serves to emphasize the vagueness of the laws that the government would use to imprison cryptocurrency entrepreneurs who labored under that lack of statutory and regulatory clarity.

### 1) Bitcoin's Regulatory Uncertainty and the Tax Code's Vague Provisions

Prior to March 25, 2014, no official IRS or other government guidance existed as to the U.S. tax classification of BTC, and no obvious analogy to BTC existed under then-current law. With no precedent or applicable guidance, taxpayers were, prior to that date, without a basis to track BTC holdings as "property," under the exit tax or any other provision of U.S. tax law, that would later require a fair-market value analysis—a state of affairs that the government now weaponizes against Ver. That anachronistic attempt to criminalize a purported "failure" on the part of a good-faith taxpayer warrants rejection by the Court.

"In our constitutional order, a vague law is no law at all."[13] As the Supreme Court recently explained, "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws. And when Congress exercises that power, it has to write statutes that give ordinary people fair warning about what the law demands of them."[14] Congress is not permitted to "set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and should be set at large."[15]

The prohibition against vague laws "rests on the twin constitutional pillars of due process and separation of powers."[16] Courts may thus find a statute unconstitutionally vague "for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."[17] Of the two concerns, "the more important . . . is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement."[18] Here, Ver was one of the first individuals who attempted in good faith to track and pay taxes on virtual currency assets. At the same time, thousands of virtual currency users

---

[13] *United States v. Davis*, 588 U.S. 445, 447 (2019).

[14] *Id*. at 447-48.

[15] *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (quoting *United States v. Reese*, 92 U.S. 214, 221 (1875)).

[16] *Davis*, 588 U.S. at 451.

[17] *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

[18] *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (internal quotation and citation omitted); *Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1237 (10th Cir. 2023) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis.") (quoting *Granyned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

made no such effort and instead withheld their virtual currency from the IRS altogether. While the government prosecuted Ver, it provided amnesty or a mere warning letter to those who hid their virtual currency until the vagueness marginally dissipated in 2019. This is a paradigm of arbitrary prosecution: criminal prosecution of those who attempt to discern the correct treatment of virtual currency while leaving untouched those who made no good faith attempt—a tacit concession that the law was in fact vague.

On March 25, 2014—*following* Ver's expatriation—the IRS issued Notice 2014-21, which purported to provide guidance on the IRS's view of the U.S. tax treatment of BTC. The IRS did not issue any additional guidance until 2019 and, notwithstanding Notice 2014-21, uncertainties regarding the U.S. tax treatment of BTC persisted through 2018. The result has been a regulatory environment that presents significant hurdles to those who, in good faith, would account for digital asset holdings and attempt to report earnings related to those assets to the IRS. The indictment criminalizes Ver for, in the government's view, the "wrong" treatment of BTC, but the ability of a reasonable person to recognize what would be considered the "wrong" treatment was not, and is not, sufficiently clear to justify criminal prosecution.

U.S. tax law describes a finite number of ideal transactions, for example, ownership and disposition of indebtedness, corporate stock, or precious metals. For those described transactions, the law attaches a set of operative tax rules. Whenever the public, including tax professionals, are confronted with a *new* asset or transaction for which no specific guidance has been issued, it becomes necessary to determine which "idealized" category that new asset or transaction it fits most neatly into.[19]

---

[19] Edward D. Kleinbard, *Equity Derivative Products: Financial Innovation's Newest Challenge to the Tax System*, 69 Tex. L. Rev. 1319, 1320 (1991).

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

This task of navigating regulatory uncertainty posed special difficulties in the case of cryptocurrencies, particularly for BTC in its infancy. The United States government—though not the DOJ or IRS—specifically acknowledged this difficulty. According to a report issued in 2013 by the U.S. Government Accountability Office (the "GAO Report"), in the absence of authoritative guidance, taxpayers were "uncertain about the proper tax treatment of virtual transactions" like transactions in BTC.[20] Some "ideal" analogues posited for BTC before the issuance of Notice 2014-21, and mentioned in the GAO Report, were (a) foreign currency, (b) non-currency capital asset, and (c) financial instrument. Each, given the actual and potential uses of digital assets like BTC, was (and remains) entirely plausible, and each carries with it differences in how such assets would be accounted for by businesses and individuals.

### 1. Foreign Currency

Foreign currency is subject to special rules under the U.S. tax code.[21] Gain or loss from the disposition of foreign currency is ordinary instead of capital.[22] Individuals generally are entitled to preferential rates on net long-term capital gains,[23] although they are subject to limitations on their ability to deduct net capital

---

[20] Government Accountability Office, "Virtual Economies and Currencies: Additional IRS Guidance Could Reduce Tax Compliance Risks," GAO-13-516 (2013), https://www.gao.gov/assets/gao-13-516.pdf.

[21] All section references herein are to the U.S. Internal Revenue Code of 1986, as amended (the IRC), and the regulations promulgated thereunder by the U.S. Department of the Treasury.

[22] 26 U.S.C. § 988(a).

[23] The top marginal U.S. federal income tax rate for individuals was 35% in 2012, 39.6% from 2013-2017, and 37% in 2018; the top long-term capital gains rate was 15% in 2012 and 20% from 2013-2018. *See* 26 U.S.C. § 1.

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

losses against ordinary income.[24] Individuals are not taxed on personal foreign currency transactions that give rise to less than $200 of gain in a tax year.[25] Moreover, if an individual's business has a "functional currency" other than the U.S. dollar, the business generally can compute its net income or loss in that functional currency and translate it into U.S. dollars at the average exchange rate for the entire tax year, instead of separately determining its foreign currency exchange gain or loss on every transaction.[26] A business' functional currency is the currency of the economic environment in which a significant part of its activities are conducted, provided the business keeps its books and records in that currency.[27] Finally, an assortment of other special provisions under the tax code could be implicated if an individual taxpayer engages in transactions with foreign currency or instruments related to foreign currency.[28]

Notwithstanding those special rules, the U.S. tax code does not define currency. In 1999, the Federal Circuit defined currency as "a medium of exchange."[29] Given that BTC was originally conceived as, and intended to be, a

---

[24] Individuals can deduct net capital losses against only $3,000 of ordinary income each year and can carry forward the remainder. *See* 26 U.S.C. § 1211(b); 26 U.S.C. § 1212(b).

[25] 26 U.S.C. § 988(e).

[26] 26 U.S.C. § 987.

[27] 26 U.S.C. § 985(b).

[28] *See, e.g.*, 26 U.S.C. § 351(e) (treating foreign currency as stocks and securities for determining whether a corporation is an investment company); 26 U.S.C. § 721(b) (analogous rule for partnerships); 26 U.S.C. § 1256 (treating foreign currency contracts as "section 1256 contracts" generally subject to tax on disposition at 60% long-term capital gain or loss and 40% short-term capital gain or loss).

[29] *AMP Inc. v. United States*, 185 F.3d 1333 (Fed. Cir. 1999), *citing* Webster's Ninth New Collegiate Dictionary (1988); *see also* IRS Revenue Ruling 74-218

---

23

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

medium of exchange,[30] it was and remains reasonable to treat BTC as a foreign currency for U.S. tax purposes—entirely at odds with the indictment's apparent assumption as to the "proper" treatment and reporting of BTC. *See, e.g.*, Ind. ¶¶ 13, 34.

### 2. Non-Currency Capital Assets

Property, other than foreign currency, that is held for investment or personal use, and not as business inventory, generally is a capital asset for U.S. tax purposes.[31] Unlike foreign currency, capital assets generally give rise to capital gain or loss (instead of ordinary income or loss) when disposed of for cash, services, or different property. Under regulations applicable to stocks and securities, which typically are capital assets for individuals, if a taxpayer purchases multiple lots of identical stocks or securities at different dates or prices and then sells part of the holdings, the taxpayer generally is deemed to sell lots in the same order acquired (so-called "first in, first out," or "FIFO," accounting) unless the taxpayer "adequately identif[ies]" which lots it has sold.[32] Although BTC is not a stock or security within the meaning of the Tax Code, the Tax Court has applied the principles of the regulations to commodity futures, which are treated as commodities (and not stock or securities) for U.S. tax purposes.[33] Treating BTC as a capital asset, therefore, would permit

---

(defining currency in a different context to include "gold, silver, [and] other metals or paper used as a circulating medium of exchange").

[30] *See* Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (2008).

[31] *See* 26 U.S.C. § 1221 (defining capital asset through exclusion of inventory, depreciable real property, and other categories of property).

[32] 26 C.F.R. § 1.1012-1(c).

[33] *Perlin v. Commissioner*, 86 T.C. 388 (1986).

taxpayers to identify which lots of BTC they sold and otherwise require FIFO accounting.[34]

### 3. Financial Instruments

If all BTC held by an individual taxpayer were treated as a single financial instrument, the taxpayer likely would still recognize capital gain or loss on disposing of the BTC for cash, services, or different property, but would calculate that gain or loss using a unitary tax basis and holding period in the BTC.[35] Again, this plausible treatment would result in a different accounting—and require different accounting tools and methods—for BTC as compared to other "ideal" forms of described assets; a source of uncertainty in the underlying legal framework against which the indictment would seek to hold Ver criminally liable.

### 2) Notice 2014-21 Warrants No Deference and Does Not Remedy the Tax Code's Vagueness

Notice 2014-21 reflects the IRS's post-Ver-extradition view that BTC is property and not virtual currency—a view that was and remains hotly disputed.[36] As

---

[34] For example, a registration statement filed with the U.S. Securities and Exchange Commission in 2013 for an investment vehicle that intended to invest in BTC disclosed that the vehicle intended to treat its BTC as a non-currency capital asset for U.S. tax purposes in the absence of any contradictory guidance. *See* Winklevoss Bitcoin Trust Form S-1 Registration Statement at 68 (July 1, 2013), *available at* https://www.sec.gov/Archives/edgar/data/1579346/000119312513279830/d562329 ds1.htm#tx562329_16.

[35] *See* 26 U.S.C. § 1012 ("The basis of property shall be the cost of such property."); 26 U.S.C. § 1222 (defining long-term and short-term).

[36] *See, e.g.*, Government Accountability Office, *Virtual Economies and Currencies: Additional IRS Guidance Could Reduce Tax Compliance Risks*, GAO-13-516 (2013) (suggesting potential tax treatment for cryptocurrency as a foreign currency, non-currency capital asset, or financial instrument); Texas Society of Certified Public Accountants, *Comments on Notice 2014-21 Outlining Application*

---

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

property, according to the guidance, BTC typically would be treated as a capital asset for individual investors who do not hold it as inventory. However, Notice 2014-21 does not even attempt to explain *why* BTC is not foreign currency, asserting simply (and today, incorrectly) that BTC "does not have legal tender status in any jurisdiction." Today of course, BTC holds status as legal tender in a growing number of jurisdictions, raising questions as to the continued validity of Notice 2014-21 on its own terms.[37]

By its own terms, Notice 2014-21's reasoning no longer warrants excluding BTC from the category of foreign currency, but even were that not so the Supreme Court's recent decision in *Loper Bright* invites the Court to set aside the IRS's unfounded "guidance" and recognize the fundamentally uncertain status of digital assets and cryptocurrency under the U.S. tax code. In *Loper Bright*, the Supreme Court reassessed its prior *Chevron* decision. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984), *overruled by Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024). *Chevron* had established a standard of review for the validity of agency regulations, under which a court would 1) determine whether a statute speaks directly to the subject of a particular regulation or agency guidance, and 2) determine, in the face of a truly ambiguous statute, whether the

_____

*of General Tax Principles to Transactions Involving Bitcoin, Other Virtual Currencies*, 1 ("Because a virtual currency functions as a currency, is widely accepted in some cases as tender and is a fungible asset, drawing on the large body of case law, regulations and rulings that already exists with respect to foreign currency transactions would present a more sensible approach."); Mindy Lowy and Miriam Abraham, *Taxation of Virtual Currency, Tax Notes*, 649, 652 (Nov. 11, 2013) ("we see a trend toward treating the Bitcoin as currency for legal and regulatory purposes, which could provide a basis for treating it that way for tax purposes as well").

[37] *See, e.g.*, Joe Hernandez, *El Salvador Just Became The First Country to Accept Bitcoin As Legal Tender*, NPR (Sept. 21, 2021); Ibrahim Ajibade, *Argentina Approves Bitcoin (\*BTC) as "Official" Currency*, Nasdaq (December 21, 2023).

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

agency's regulation was a reasonable interpretation of the statute, thereby warranting judicial deference to the agency's "reasonable" interpretation.

*Loper Bright* overruled *Chevron*, holding that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 144 S. Ct. at 2273. Because *Chevron* previously applied to the interpretation of tax regulations and guidance, *see Mayo Found. v. United States*, 562 U.S. 44 (2010), *Chevron's* demise returns this Court to its proper role in assessing the ambiguity of statutes without deference to a regulation purporting to save that statute from its own ambiguity.

### 3) The Indictment Charges an Impermissibly Vague "Offense"

Without the already unpersuasive "guidance" issued under Notice 2014-21, the Tax Code is impermissibly vague as to the proper treatment of BTC. That vagueness, in turn, places taxpayers acting in good faith in an untenable position: Unanswered questions on the U.S. tax treatment of BTC result in the reasonable adoption of different tax basis tracking and reporting positions by different taxpayers and tax professionals. The reasonable possibility of these multiple approaches, in turn, renders the indictment an attempt to criminalize conduct in the face of a fundamentally unclear statutory regime. While the indictment's charges are themselves filed under the mail fraud statute (18 U.S.C. § 1341) and various sections of Title 26, each of those charges incorporates the Tax Code. Repeatedly, the indictment references the Tax Code as a means of defining the substance of its charges. *See, e.g.,* Ind. ¶¶ 13, 14, 18. At bottom, the indictment claims that Ver failed to disclose the "number and value of bitcoins he owned," without once grappling with the Tax Code's lack of any provision that would make reporting in such a manner necessary.

Given the undefined sweep of the Tax Code outside of its small set of defined and described categories of property, *Congress*—not the Executive or Judicial Branches—must return to the drawing board. "[T]he role of courts under our

Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again."[38]

### C.    The Government's Selective Quotation and Disregard of Exculpatory Evidence Warrants Dismissal

The indictment incorporates by reference and selectively quotes a number of communications and documents that, when provided in full, exonerate rather than inculpate. The indictment arose, moreover, from blatant interference in Ver's attorney-client privilege and in apparent contravention of Department of Justice policy. This consistent disregard for fundamental fairness before the Grand Jury also warrants dismissal of the indictment.

The Constitution provides that "[n]o person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury." U.S. Const. amend. V. While prosecutors have broad powers in conducting grand jury proceedings, that discretion is not boundless. "The prosecutor may not circumvent [the grand jury's constitutional] safeguard by overreaching conduct that deprives the grand jury of autonomous and unbiased judgment." *United States v. Al Mudarris*, 695 F.2d 1182, 1184 (9th Cir. 1983). "Courts therefore will act when the grand jury's function has been so subverted as to compromise the integrity of the judicial process. They may dismiss an indictment as an exercise of their inherent supervisory power, or to protect a defendant's due process rights." *Id.* at 1185 (citations omitted).

As recounted above, the government's grand jury presentation, and the resulting indictment, appears to have relied on a pattern of selective presentation of out-of-context, partial quotations to present a false narrative of willful tax evasion.

For instance, Ind. ¶ 27.c portrays Ver as a man intent on leaving the United States:

_____

[38] *Davis*, 588 U.S. at 448.

19          c.   After failing to obtain citizenship in several other

20 countries, in early December 2013, defendant VER told Law Firm 1 that

21 he believed he would be able to obtain citizenship from St. Kitts and

22 renounce his U.S. citizenship by the end of the year.

In fact, the underlying communication makes clear that Ver's primary focus was ensuring that his "exit tax payments [were] as clean as possible, with *no room to have trouble from the IRS.*"

**From:** Roger Ver [mailto:roger@memorydealers.com]
**Sent:** Friday, April 26, 2013 11:09 AM
**To:** Employee 1
**Cc:** Return Preparer 2 Return Preparer 3 Return Preparer 1 Law Firm 1 Appraiser 1
**Subject:** Renunciation

Hi Everyone,
(██████ team, Law Firm 1 team, Employee 1 and Appraiser 1)

Everything seems to take a bit longer than planned, but things are moving along with my citizenship application in another country,
and I plan to be able to renounce my US citizenship by the first half of June.

————————————————————————————————————————————— ██████_011145

I want to make sure that my exit tax payments are as clean as possible, with no room to have trouble from the IRS in the future.

*See* Ex. 1 (summarized, misleadingly and in part, in Ind. ¶ 27.c).

Likewise, the document quoted in Ind. ¶ 27.e.vi is used to claim that Ver was expressly instructed by his advisors to use a spot price valuation method:

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

21              vi.   A few weeks later, Return Preparer 1 told
22    defendant VER that Lawyer 1, another employee of Law Firm 1, had
23    determined that they had to use the $800 per bitcoin value and again
24    asked defendant VER how many bitcoins defendant VER personally held.
25    Defendant VER withheld the requested information once more, and
26    instead said that using the $800 per bitcoin value was "impossible
27    and unreasonable." Lawyer 1 later told defendant VER that they were
28    legally required to use the $800 per bitcoin value.

    In fact, this was effectively the *opposite* of the advice Ver ultimately received,
as the government well knows. In the same email, following "some additional
research," Ver's advisors determine that a discount should apply (*i.e.*, that they
would not be using the $800/BTC spot price valuation), and recommend that Ver
hire an appraiser:

| | |
|---|---|
| **Message** | |

| | |
|---|---|
| **From:** | Lawyer 1 |
| **Sent:** | 10/14/2015 8:16:35 PM |
| **To:** | Roger Ver [roger@memorydealers.com]; Return Preparer 1 |
| **Subject:** | Re: Rental income, bitcoin valuation, update on company appraisals |

Dear Roger,

We did some additional research on valuation of your BTC.

Not surprisingly, the IRS has no rules about cryptocurrency specifically, but we can compare BTCs to publicly traded stock. This is how it works for publicly traded stock.

DEFAULT RULE
Unit price is the exchange price. Total value is number of shares multiplied by unit price.

EXCEPTION FOR LARGE SHAREHOLDERS
If you own a block of shares that you cannot sell without depressing the market, then you can take this effect into consideration and discount the shares. However, because the default rule is number of shares times unit price, it is up to the shareholder to establish the discounted price.

NEXT ACTION
We think you can use this valuation method for your BTC. However, because we have the burden of proving the value is not number of BTC times exchange price, we would like an appraisal of your BTC value by a third party who has no personal interest in the tax implications of the appraisal. Do you know someone who is qualified to appraise your BTC holdings who can do this?

Best regards,



*See* Ex. 4 (quoted, in part, in Ind. ¶ 27.e.vi).

    The same game is played in Ind. ¶¶ 27.e.iv and 27.e.vii, in which the government presents Ver as actively avoiding questions from his advisors. The government knows the full communications reveal Ver grappling with questions that were impossible to answer given the data available to him, and the accounting

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

procedures used prior to federal guidance defining the tax treatment of BTC. *See* Ex. 6 (quoted, in part, in Ind. ¶ 27.e.iv); Ex. 7 (quoted, in part, in Ind. ¶ 26.e.vii).

Presented in context, these and other communications exculpate Ver again and again. The omission of the full context of those communications raises the significant specter of the government's presentation of a misleading picture of Ver's intent.

## IV.   CONCLUSION

This prosecution must end. The evidence that the government withheld from the grand jury and with which it has been recently provided make clear that this indictment was obtained and continues to be prosecuted without regard to fundamental fairness or due process. The charges are lodged against a legal background that provides no guidance to people of reasonable intelligence—or, indeed, people of highly trained specialization in U.S. tax law—as to the limits and proscriptions of the criminal law. The exit tax ignores core constitutional protections against an entire category of taxes. For all of these reasons, the indictment must be dismissed.

*[Signature page to follow]*

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

Dated: December 3, 2024          Respectfully submitted,


*/s/ Ashwin J. Ram*
Ashwin J. Ram (SBN: 277513)
aram@steptoe.com
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
+1 213 439 9400

Andrew C. Adams (*pro hac vice* motion forthcoming)
acadams@steptoe.com
1114 6th Ave.
New York, NY 10036
+1 212 506 3900

Nicholas P. Silverman (*pro hac vice* motion forthcoming)
nsilverman@steptoe.com
Galen C. Kast (*pro hac vice* motion forthcoming)
gkast@steptoe.com
1330 Connecticut Ave.
Washington, DC 20026
+ 1 202 429 3000
**Steptoe LLP**

Darrell P. White (SBN: 270038)
dwhite@klw-law.com
17631 Fitch
Irvine, CA 92614
+1 949 474 0940
**Kimura London & White LLP**

*Attorneys for Defendant Roger Keith Ver*

DEFENDANT ROGER K. VER'S MOTION TO DISMISS
CASE NO. 2: 24-CR-00103-MWF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## L.R. 11-6.2 Certificate of Compliance

The undersigned, counsel of record for Defendant Roger K. Ver certifies that this brief contains 9,539 words, for which Defendant has requested an enlarged word limit.

Dated: December 3, 2024            Respectfully submitted,

*/s/ Ashwin J. Ram*
Ashwin J. Ram (SBN: 277513)
aram@steptoe.com
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
+1 213 439 9400

Andrew C. Adams (*pro hac vice* motion forthcoming)
acadams@steptoe.com
1114 6th Ave.
New York, NY 10036
+1 212 506 3900

Nicholas P. Silverman (*pro hac vice* motion forthcoming)
nsilverman@steptoe.com
Galen C. Kast (*pro hac vice* motion forthcoming)
gkast@steptoe.com
1330 Connecticut Ave. NW
Washington, DC 20026
+ 1 202 429 3000
**Steptoe LLP**

Darrell P. White (SBN: 270038)
dwhite@klw-law.com
17631 Fitch
Irvine, CA 92614
+1 949 474 0940
**Kimura London & White LLP**

*Attorneys for Defendant Roger Keith Ver*

CERTIFICATE OF COMPLIANCE
CASE NO. 2: 24-CR-00103-MWF