E. MARTIN ESTRADA
United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
MATTHEW J. KLUGE (PABN 204285)
Assistant Chief, Tax Division
PETER J. ANTHONY (NYBN 4940912)
Trial Attorney, Tax Division
     150 M Street N.E., Room 2.206
     Washington, D.C. 20002
     Telephone: (202) 305-3301
     Facsimile: (202) 514-9623
     E-mail: Matthew.J.Kluge@usdoj.gov
JAMES C. HUGHES (CABN 263878)
     Assistant United States Attorney
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2579
     Facsimile: (213) 894-6269
     E-mail: James.Hughes2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 24-CR-00103-MWF |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT |
| v. | |
| ROGER KEITH VER, | Hearing Date: February 10, 2025 Hearing Time: 1:30 p.m. |
| Defendant. | Location:     First Street Courthouse, Courtroom 5A |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California; Matthew J. Kluge, Assistant Chief, Tax Division; Peter J. Anthony, Trial Attorney, Tax Division; and Assistant United States Attorney James C. Hughes, hereby files its Opposition to Defendant's Motion to Dismiss.

1       This Opposition is based upon the attached memorandum of points

2   and authorities, the files and records in this case, the Declaration

3   of IRS Special Agent Jeremiah Haynie, and such further evidence and

4   argument as the Court may permit.

5   Dated: January 13, 2025        Respectfully submitted,

6                             E. MARTIN ESTRADA
                          United States Attorney
7

8                             LINDSEY GREER DOTSON
                          Assistant United States Attorney
                          Chief, Criminal Division
9

10                                  /s/
                          ——————————————————
11                            MATTHEW J. KLUGE (PABN 204285)
                          Assistant Chief, Tax Division
                          PETER J. ANTHONY (NYBN 4940912)
12                            Trial Attorney, Tax Division

13                            JAMES C. HUGHES
                          Assistant United States Attorney
14

15                            Attorneys for Plaintiff
                          UNITED STATES OF AMERICA

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

DESCRIPTION                                                                  PAGE

TABLE OF AUTHORITIES.............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION................................................1

II.   BACKGROUND..................................................3

      A.    Factual Background....................................3

      B.    Procedural History...................................7

      C.    Expatriation and the Tax Code........................7

            1.    The Exit Tax...................................8

            2.    Expatriation Statement........................10

III.  STANDARD OF REVIEW.........................................10

IV.   THE COURT SHOULD APPLY THE FUGITIVE DISENTITLEMENT DOCTRINE...10

      A.    Ver Is a Fugitive...................................11

      B.    The Equities Support Application of the Doctrine........12

V.    MERITS ARGUMENTS...........................................14

      A.    The Exit Tax Is Constitutional......................15

            1.    The Tax Falls Within Congress' Taxing Power........15

            2.    The Tax Does Not Violate Due Process...............24

      B.    Ver's Void-For-Vagueness Challenge Fails.................30

            1.    Unconstitutional Vagueness is a High Bar............30

            2.    The Charges as Applied Are Not Vague...............31

            3.    Ver Had Notice................................35

            4.    Scienter Requirements Eliminate Any Vagueness
                  Concern.......................................36

      C.    Ver's "Selective Quotation" Argument Is Meritless........36

VI.   CONCLUSION.................................................39

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                          PAGE

**CASES**

*Afroyim v. Rusk*, 387 U.S. 253 (1967)................................27, 28

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988)..........38

*Barclay & Co. v. Edwards*, 267 U.S. 442 (1924)......................29

*Best Life Assur. Co. of California v. Commissioner*, 281 F.3d 828
    (9th Cir. 2002)..................................................21

*Brushaber v. Union Pac. R. Co.*, 240 U.S. 1 (1916)..............16, 29

*Chiles v. United States*, 843 F.2d 367 (9th Cir. 1987)..............29

*Conforte v. Commissioner*, 692 F.2d 587 (9th Cir. 1982)............10

*Cottage Sav. Ass'n v. Commissioner*, 499 U.S. 554 (1991)........22, 23

*Crow v. Commissioner*, 85 T.C. 376 (1985)..........................19

*Dep't of State v. Munoz*, 602 U.S. 899 (2024)......................25

*Diedrich v. Commissioner*, 457 U.S. 191 (1982).....................22

*Eisner v. Macomber*, 252 U.S. 189 (1920)...........................21

*Estate of Elkins v. Commissioner*, 767 F.3d 443 (5th Cir. 2014).....32

*Flint v. Stone Tracy Co.*, 220 U.S. 107 (1911).................17, 18

*Helvering v. Griffiths*, 318 U.S. 373 (1943).......................21

*Hylton v. United States*, 3 U.S. (3 Dall.) 171 (1796).......15, 16, 17

*In re Assets of Martin*, 1 F.3d 1351 (3d Cir. 1993)................11

*In re Han Yong Kim*, 571 F. App'x 556 (9th Cir. 2014).............11

*In re Hijazi*, 589 F.3d 401 (7th Cir. 2009).......................13

*Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019)......................35

*Kawashima v. Holder*, 565 U.S. 478 (2012)..........................36

*Knowlton v. Moore*, 178 U.S. 41 (1900).........................17, 18

*L'Association des Américains Accidentels v. Dep't of State*, 656
    F.Supp.3d 165 (D.D.C. 2023).....................................26

*Loper Bright Enters. v. Raimondo*, 603 U.S 369 (2024)..............34

ii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

*MacLaughlin v. All. Ins. Co. of Philadelphia*, 286 U.S. 244
    (1932)........................................................22

*Maehr v. Dep't of State*, 5 F.4th 1100 (10th Cir. 2021)............26

*Marr v. United States*, 268 U.S. 536 (1925)........................23

*Mastro v. Rigby*, 764 F.3d 1090 (9th Cir. 2014)....................12

*McFadden v. United States*, 576 U.S. 186 (2015)....................36

*Molinaro v. New Jersey*, 396 U.S. 365 (1970).......................13

*Moore v. United States*, 36 F.4th 930 (9th Cir. 2022)..............20

*Moore v. United States*, 602 U.S. 572 (2024)..................passim

*Murphy v. I.R.S.*, 493 F.3d 170 (D.C. Cir. 2007)...................19

*Murray v. The Charming Betsy*, 6 U.S.(2 Cranch) 64 (1804)..........26

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012)...15, 16,
    17, 18

*Nat'l Standard Co. v. Commissioner*, 80 T.C. 551 (1983)............33

*Ortega-Rodriguez v. United States*, 507 U.S. 234 (1993)........12, 13

*Parretti v. United States*, 143 F.3d 508 (9th Cir. 1998).......12, 13

*Patton v. Brady*, 184 U.S. 608 (1902)..............................17

*Richards v. Sec'y of State*, 752 F.2d 1413 (9th Cir. 1985).........27

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973)......28

*Savorgnan v. United States*, 338 U.S. 491 (1950)...................26

*Schuster v. United States*, 765 F.2d 1047 (11th Cir. 1985).........11

*Screws v. United States*, 325 U.S. 91 (1945).......................36

*Shanks v. Dupont*, 28 U.S. (3 Pet.) 242 (1830).....................28

*Skilling v. United States*, 561 U.S. 358 (2010)....................30

*Smith v. United States*, 94 U.S. 97 (1876).........................12

*Sze v. Johnson*, 172 F. Supp. 3d 112 (D.D.C. 2016)................26

*Thomas v. United States*, 192 U.S. 363 (1904)..................16, 17

iii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

*Tiger Eye Trading, LLC v. Commissioner*, 138 T.C. 67 (2012)........33

*Tyler v. United States*, 281 U.S. 497 (1930)...............16, 17, 18

*United States v. $671,160.00 in U.S. Currency*, 730 F.3d 1051
    (9th Cir. 2013)...........................................11, 12

*United States v. Al Mudarris*, 695 F.2d 1182 (9th Cir. 1983)........37

*United States v. Bescond*, 24 F.4th 759 (2d Cir. 2021).............13

*United States v. Buckley*, 689 F.2d 893 (9th Cir. 1982).............10

*United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020).............36

*United States v. Catino*, 735 F.2d 718 (2d Cir. 1984)..............11

*United States v. Chung Cheng Yeh*, No. CR 10-00231 WHA, 2013 WL
    2146572 (N.D. Cal. May 15, 2013)...............................11

*United States v. Fisher*, 607 F. App'x 645 (9th Cir. 2015)..........36

*United States v. Fritz*, 852 F.2d 1175 (9th Cir. 1988).............38

*United States v. Gonzalez*, 300 F.3d 1048 (9th Cir. 2002)..........12

*United States v. Harris*, 705 F.3d 929 (9th Cir. 2013).............32

*United States v. Isgro*, 974 F.2d 1091 (9th Cir. 1992).............37

*United States v. James*, 333 F.2d 748 (9th Cir. 1964).............21

*United States v. Jensen*, 93 F.3d 667 (9th Cir. 1996).............10

*United States v. Jinian*, 725 F.3d 954 (9th Cir. 2013).............36

*United States v. Juvenile Male*, 670 F.3d 999 (9th Cir. 2012).......29

*United States v. Kearns*, 5 F.3d 1251 (9th Cir. 1993).............37

*United States v. Lee*, 455 U.S. 252 (1982)........................29

*United States v. Lucero*, 989 F.3d 1088 (9th Cir. 2021).....30, 31, 32

*United States v. Martirossian*, 917 F.3d 883 (6th Cir. 2019)....11, 12

*United States v. Mead*, 533 U.S. 218 (2001)........................34

*United States v. Mfrs. Nat. Bank of Detroit*, 363 U.S. 194 (1960)...17

*United States v. Murguia-Oliveros*, 421 F.3d 951 (9th Cir. 2005)....13

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

*United States v. Nat'l Diary Prods. Corp.*, 372 U.S. 29 (1963)......30

*United States v. Phellis*, 257 U.S. 156 (1921).....................23

*United States v. Ptasynski*, 462 U.S. 74 (1983)....................15

*United States v. Rodgers*, 461 U.S. 677 (1983).....................29

*United States v. Rogers*, 751 F.2d 1074 (9th Cir. 1985)............36

*United States v. Shaheen*, 445 F.2d 6 (7th Cir. 1971)..............28

*United States v. Shalhoub*, 855 F.3d 1255 (11th Cir. 2017).........11

*United States v. Stanzione*, 391 F. Supp. 1201 (S.D.N.Y. 1975)..11, 14

*United States v. Terabelian*, 105 F.4th 1207 (9th Cir. 2024).......13

*United States v. Williams*, 504 U.S. 36 (1992).....................38

*United States v. Williams*, 553 U.S. 285 (2008)............30, 31, 32

*Weiss v. Stearn*, 265 U.S. 242 (1924)..............................23

*Yin v. United States*, 31 F.2d 738 (9th Cir. 1929).................28

**STATUTES**

18 U.S.C. § 1341......................................................7

19 U.S.C. § 2432.....................................................27

26 U.S.C. § 7201......................................................7

26 U.S.C. § 7206(1)...................................................7

8 U.S.C. § 1481.............................................8, 24, 25

Expatriation Act of 1907, Pub. L. No. 59-193, 34 Stat. 1228........28

Foreign Investors Tax Act of 1966, Pub. L. 89-809, 80 Stat. 1539....7

Health Insurance Portability and Accountability Act of 1996,
    Pub. L. 104-191, 110 Stat. 1936..................................8

I.R.C. § 1221........................................................33

I.R.C. § 1256........................................................21

I.R.C. § 1259........................................................22

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                  PAGE

I.R.C. § 1272...........................................................22

I.R.C. § 1296...........................................................22

I.R.C. § 1361...........................................................23

I.R.C. § 301........................................................31, 35

I.R.C. § 305...........................................................22

I.R.C. § 317...........................................................35

I.R.C. § 467...........................................................22

I.R.C. § 475...........................................................21

I.R.C. § 6039G...............................................8, 14, 31, 34

I.R.C. § 877............................................................7

I.R.C. § 877A......................................................passim

Income Tax Act, R.S.C. 1985, c.1, § 128.1..........................27

**OTHER AUTHORITIES**

1 Mertens Law of Fed. Income Tax'n § 5:5 (Mar. 2023)...............28

*2024 Instructions for Form 8854*, IRS.gov,
    *https://www.irs.gov/instructions/i8854*........................11

Andrew Appleby, *No Migration Without Taxation: State Exit Taxes*,
    60 HARV. J. ON LEGIS. 55 (2023) .................................35

David Voreacos & Olga Kharif, '*Bitcoin Jesus' Fights IRS Tax
    Evasion Case From Spanish Island*, Bloomberg (November 13,
    2024), https://www.bloomberg.com/news/articles/2024-11-13/-
    bitcoin-jesus-fights-irs-tax-evasion-case-from-spanish-
    island...........................................................2

Fed. R. of Crim. P. 12(b)(1)......................................11

Kuntz & Peroni, U.S. Int'l Tax, Nondiscrimination Clauses, 2000
    WL 530244 (2024).................................................24

Letter 6174, (6-2019), I.R.S. (July 16, 2019),
    https://www.irs.gov/pub/notices/letter_6174.pdf.................4

S. Rep. No 110-1 (2007)...........................................31

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                                 <u>PAGE</u>

Treasury Inspector General for Tax Administration, *More
     Enforcement and a Centralized Compliance Effort Are
     Required for Expatriation Provisions*, Oversight.gov (Sept.
     20, 2020),
     https://www.oversight.gov/sites/default/files/documents/rep
     orts/2020-09/202030071fr.pdf.................................10

U.S. Const., Art. I, § 8.........................................18

U.S. Const., Art. I, § 9.........................................18

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.    INTRODUCTION**

Defendant Roger Ver was indicted by a grand jury on tax-related charges for concealing critical information and lying to avoid paying nearly $50 million in taxes. That is the core of this case.

As alleged, Ver was an early and avid promoter of bitcoins, which Ver praised for "mak[ing] it so incredibly easy for people to hide their incomes or evade taxes." Ver, either personally or through his two U.S. companies, began acquiring bitcoins in 2011.

In February 2014, Ver obtained citizenship in St. Kitts and renounced his U.S. citizenship a month later. Given his wealth, Ver's renouncement triggered an obligation to file expatriation-related tax returns and pay tax on any gain from the constructive sale of all of his property, including his bitcoins.

By February 2014, Ver and his companies owned approximately 131,000 bitcoins: 73,000 owned by Ver through his companies and 58,000 owned by Ver personally. Bitcoins were trading between $782 and $960 across several large exchanges. Thus, Ver's total bitcoin holdings were worth, absent discounts, at least $102.4 million. The companies' bitcoins were worth at least $57 million; Ver's were worth at least $45 million.

Yet, Ver's tax returns claimed that his companies owned bitcoins worth only $1.4 million and that Ver himself owned *none*. Contrary to the revisionist history in Ver's brief, it was Ver's lies and concealment that account for the enormous gulf between the value of Ver's bitcoin holdings and what he reported to the IRS. Indeed, the indictment outlines numerous instances where Ver's advisors requested Ver provide them with the foundational information of how many

bitcoins Ver owned—and numerous instances where Ver either refused to tell them or lied.

In addition, the indictment alleges that in 2017, Ver took personal ownership of his companies' bitcoins, which he had been advised could trigger U.S. tax consequences to him. He later sold many of them for over $200 million. Yet, when his accountant asked him point blank whether he had received any property or distributions from the companies, Ver lied and said no. The accountant then prepared a tax return incorporating that lie, which Ver signed under penalties of perjury.

Now, while Ver sits on the Mediterranean island of Mallorca[1] contesting his extradition to the U.S., Ver has moved to dismiss the indictment against him on three grounds: (1) the tax imposed upon some high-net-worth or high-income individuals who relinquish their U.S. citizenship is unconstitutional, (2) the charges are void for vagueness due to purported uncertainty in bitcoins' tax treatment, and (3) the indictment supposedly selectively quotes from certain communications.

Ver does not raise a single legal or factual ground that warrants dismissal. And given Ver's status as a constructive fugitive, this Court should decline to rule on his motion at this time and then, only after Ver has been extradited, deny it.

---

[1] *See* David Voreacos & Olga Kharif, '*Bitcoin Jesus' Fights IRS Tax Evasion Case From Spanish Island*, Bloomberg (November 13, 2024), https://www.bloomberg.com/news/articles/2024-11-13/-bitcoin-jesus-fights-irs-tax-evasion-case-from-spanish-island.

## II.   BACKGROUND

### A.   Factual Background

An early bitcoin investor, Ver began acquiring bitcoins in 2011 for himself and his two companies, MemoryDealers and Agilestar. (Indictment ¶¶ 6-7.) By early 2014, Ver controlled—either directly or through his companies—approximately 131,000 bitcoins, most of which Ver acquired for less than $32 each. (*Id.* ¶ 27(e)(i).) By February 2014, the bitcoin price shot up and was trading on large exchanges for between $782 and $960. (*Id.*) From the start, Ver was an avid promotor of bitcoins, even earning the moniker "Bitcoin Jesus." (*Id.* ¶ 6.)

Ver touted one aspect of bitcoins: how they allow people to hide their income and evade their taxes. For example, in February 2016—just a few months *before* Ver filed his expatriation-related returns—Ver gave a speech at "Anarchapulco," an annual "anarcho-capitalist" convention, where he said bitcoin makes tax evasion "incredibly easy":

> Bitcoin completely undermines the power of every single government...to tax people's income, to control them in any way....
>
> Bitcoin [] makes it so incredibly easy for people to hide their income or evade taxes...

Ex 1. ¶ 6(Declaration of Jeremiah Haynie). Ver then gleefully recounted how multiple people had contacted him asking for advice about how to use bitcoin to evade their taxes, including one "panicked" friend who told Ver "I need you to show me how to hide my bitcoin so that I don't have to pay taxes on it." (*Id.*)

As his bitcoin portfolio grew, Ver expatriated. (Indictment ¶¶ 17-18). He relinquished his U.S. citizenship for all non-tax purposes

in February 2014 when he became a Kittitian citizen, and did so for tax purposes in March. (*Id.*) As explained below, as a high-net-worth individual who performed one of four triggering acts, Ver's relinquishment had tax consequences. (*Id.* ¶¶ 13-14.) Ver hired professionals—lawyers, accountants, and appraisers—to advise him on those consequences. (*Id.* ¶¶ 15-16.) But when these professionals repeatedly sought information from Ver regarding his bitcoins, Ver hid that information from them. (*Id.* ¶¶ 27(e)(iv), (vi), (xvi), (xx)-(xxii).)[2]

Ver also did not correct Appraiser 2's, an appraiser Ver hired, wildly inaccurate valuations of the companies, including their bitcoins, even after being alerted of an issue with them. (*Id.* ¶¶ 27(e)(viii)-(xiv).) Relying on the company's records, Appraiser 2 included a value of MemoryDealers' bitcoins at around $1.3 million and Agilestar's at $113,582. (*Id.* ¶ 27(e)(x).) These figures would have been clearly inaccurate to Ver. Collectively, the companies possessed approximately 73,000 bitcoins. (*Id.* ¶ 27(e)(i).) Thus, Appraiser 2's valuation of the companies treated the bitcoins as being worth only about $19 each, which amounted to a 98% discount from bitcoins' price on the open market. Put another way, Appraiser 2

---

[2] Ver claims that the IRS offered "amnesty" in 2019 to taxpayers who had not reported their cryptocurrency gains but not to him. (Ver Brief at 3 n.1 ("Br.").) That press release does nothing of the sort, only announcing that certain taxpayers would receive so-called "educational letters" about the taxation of virtual currency. Two of them included a warning that if the taxpayer did "not accurately report [their] virtual currency transactions, [they] may be subject to future civil and criminal enforcement activity." *E.g.*, Letter 6174, (6-2019), I.R.S. (July 16, 2019), https://www.irs.gov/pub/notices/letter_6174.pdf. Only those taxpayers who had not yet filed a tax return were to receive the letter without the warning.

4

effectively valued the two companies as if they held only 1,758 bitcoins, not 73,000.

Employee 1, a MemoryDealers employee, provided the appraisals to Return Preparer 2-the companies' outside accountant-for his input. (*Id.* ¶ 27(e)(xi).) In response, Return Preparer 2 questioned the bitcoins' valuations, and instructed them to clarify with Appraiser 2 "if the Bitcoin values are market value on the dates of valuation." (*Id.*) He further explained that the "value should be: the total Bitcoins x the Average Market Price on Date of Valuation." (*Id.*) Employee 1 shared this response with Ver, but Ver raised no objection. (*Id.* ¶ 27(e)(xii)-(xiii).)[3] Instead, the valuations were provided unchanged to Law Firm 1 and incorporated into Ver's returns. (*Id.* ¶ 27(e)(xiv).)

As for Ver's personal bitcoin holdings, Ver told Appraiser 2 that he owned approximately 25,000 bitcoins himself. (*Id.* ¶ 27(e)(xxvi).) For this to be true, it would mean Ver believed that of his 131,000 bitcoins, his companies held 106,000, with a market value of $82 million, an even larger discrepancy from the $1.4 million value Appraiser 2 assigned them. (*Id.* ¶ 22.) Ver was thus well aware that Appraiser 2's conclusions were wrong.

After years of repeatedly telling his advisors that he personally owned bitcoins, Ver changed course, providing a new lie that he believed he had given his girlfriend *all* his bitcoins years earlier. Ver told Lawyer 1: "[p]erhaps it will be easier for tax reporting requirements if I gave all my bitcoins to my partner (not

_____

[3] Ver's discussion of the nature of the bitcoin markets in his brief, *e.g.* Br. at 5, is irrelevant considering Ver's misrepresentations and concealments about the number of bitcoins he and his companies owned.

legally married wife) in Japan?" (*Id.* ¶ 27(e)(xxvii).) Subsequently, Ver filed a gift tax return in May 2016, falsely claiming he had gifted 25,000 bitcoins to his girlfriend in November 2011. (*Id.* ¶ 27(e)(xxix).) And yet all the while, he had continued to spend them. In fact, just a few months before he expatriated, Ver donated over $1 million worth of bitcoins to charity and claimed a tax deduction for it. (*Id.* ¶ 11.)

Unsurprisingly then, Ver's expatriation-related tax returns, filed in May 2016, drastically misrepresented his bitcoin holdings. Ver's 2014 Initial and Annual Expatriation Statement (Form 8854) did not report any personally owned bitcoins and underreported the values of his companies. (*Id.* ¶ 27(g).) His 2014 U.S. Nonresident Alien Income Tax Return (Form 1040NR) did not report or pay tax on any gain from the constructive sale of any personally owned bitcoins and substantially underreported gains from the constructive sales of the companies. (*Id.* ¶ 27(f).)

Ver also misrepresented and concealed income he received in 2017 from distributions of his companies' bitcoins to him. On June 19, 2017, Ver instructed Employee 1 to "close out" the bitcoin balance, which caused the removal of all bitcoins as assets from his companies' financial records. (*Id.* ¶ 27(i)(iv).) Ver later transferred tens of thousands of bitcoins to exchange accounts in his name and sold them. (*Id.* ¶ 27(vi).) He then transferred approximately $240 million to Bahamian bank accounts under his control. (*Id.*)

Ver concealed these bitcoin distributions from Return Preparer 1. (*Id.* ¶ 27(vii).) When Return Preparer 1 asked if he had received any income or distributions from the companies during 2017, Ver lied

and said he had not.[4] (*Id.*) Thus, Ver's 2017 Form 1040NR did not report any gain or pay any tax related to these distributions. (*Id.* ¶ 27(viii).)

All told, the false statements and material omissions on Ver's 2014 and 2017 returns caused at least a $48 million tax loss to the U.S. (*Id.* ¶ 27(j).)[5]

### B.   Procedural History

A grand jury returned an indictment on February 15, 2024, charging Ver with three counts of mail fraud, in violation of 18 U.S.C. § 1341; two counts of tax evasion, in violation of 26 U.S.C. § 7201; and three counts of filing false tax returns, in violation of 26 U.S.C. § 7206(1).

At the government's request, Ver was arrested in Spain on April 26, 2024. (Ex. 1 ¶ 5.) Since then, Ver has resisted the government's extradition request. (*Id.*) In October 2024, a Spanish court granted the request. (*Id.*) Ver appealed. (*Id.*) Ver is not currently detained. (*Id.*)

### C.   Expatriation and the Tax Code

For nearly sixty years, Congress has imposed a tax on certain individuals who relinquish their U.S. citizenship. *See* Foreign Investors Tax Act of 1966, Pub. L. 89-809, 80 Stat. 1539 (codified at I.R.C. § 877). In 1996, Congress added a requirement that any U.S. citizen who gives up their citizenship must provide the government

---

[4] It is irrelevant that Ver and Return Preparer 1 later discussed Ver's bitcoin sales on U.S exchanges, (*see* Br. at 10), as the taxable event was the distribution of the bitcoins, not their sale.

[5] Bizarrely, even though the indictment specifically alleges how much tax Ver did not pay, Ver repeatedly claims otherwise, (Br. at 1, 2, & 12).

7

with information detailing their "income, assets, and liabilities."
*See* Health Insurance Portability and Accountability Act, Pub. L. 104-191, 110 Stat. 1936 (now codified at I.R.C. § 6039G). Finally, in 2008, Congress replaced the tax under section 877 with the current regime, which resides in section 877A of the Code. These provisions generally require the payment of an "exit tax" by certain high-income or high-net-worth expatriates and the filing of an expatriation statement.

      1.   <u>The Exit Tax</u>

    Loss of U.S. citizenship does not, on its own, trigger the tax and is instead governed by different standards. The Immigration and Nationality Act ("INA") governs when an individual loses U.S. citizenship for all purposes other than tax. *See* 8 U.S.C. §§ 1481-89. One loses citizenship under the INA by committing certain acts, including obtaining citizenship in another country or enlisting in a foreign army that is engaged in hostilities against the U.S. *Id.* § 1481.

    By contrast, under the Tax Code, an individual is still considered a U.S. citizen for tax purposes until the earliest of four events:

- Renouncing one's citizenship before a U.S. diplomatic or consular officer,

- Providing the State Department with a signed statement of voluntary relinquishment of U.S. nationality,

- The State Department issues a certificate of loss of nationality, or

- A court enters an order canceling a naturalized citizen's citizenship.

I.R.C. §§ 877A(g)(4), 7701(50). Until one of these events occurs, an expatriate continues to be treated as a U.S. citizen for tax purposes and does not owe the exit tax.

Once an individual relinquishes citizenship for tax purposes, section 877A imposes a tax only if they are a "covered expatriate." *Id.* § 877A(a). A "covered expatriate" is defined narrowly. Other than someone who fails to file the requisite certification, it only applies to an individual whose:

- Average annual net income *tax* (not income) exceeds $124,000 [in 2004 dollars, adjusted for inflation], or

- Net worth on the expatriation date for tax purposes is greater than $2,000,000.

In other words, *only* high-income or high-net-worth expatriates may owe a tax, and even then, some do not.[6]

In determining the amount of such tax, if any, all property of a covered expatriate is treated as having been sold on the day before the expatriation date for the property's fair market value. *Id.* § 877A(a)(1). A tax is owed if there is a gain above $600,000 (in 2008 dollars, adjusted for inflation). *Id.* § 877A(a)(3). Conversely, if

---

[6] According to a recent report, less than 12% of all expatriates satisfied either requirement. *See* Treasury Inspector General for Tax Administration, *More Enforcement and a Centralized Compliance Effort Are Required for Expatriation Provisions*, Oversight.gov (Sept. 20, 2020), https://www.oversight.gov/sites/default/files/documents/reports/2020-09/202030071fr.pdf.

there is a loss, the taxpayer can use those losses to offset their other income if otherwise allowed. *Id.* § 877A(a)(2)(B).

Even then, covered expatriates have the option of deferring, for any reason, the payment of the exit tax with respect to any property until after such property is disposed of, so long as a bond is posted. *Id.* § 877A(b).

### 2.  Expatriation Statement

In addition to the exit tax, expatriates must provide a statement that details, among other things, their "income, assets, and liabilities." *Id.* § 6039G. They use Initial and Annual Expatriation Statement (Form 8854), to satisfy this requirement.[7]

## III. STANDARD OF REVIEW

Though he does not cite it, Ver presumably filed this motion under Federal Rule of Criminal Procedure 12(b)(1). Importantly, such motions are not vehicles to weigh the strength or weakness of the government's evidence. *See United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996). And "[t]he allegations of the indictment are presumed to be true." *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982).

## IV. THE COURT SHOULD APPLY THE FUGITIVE DISENTITLEMENT DOCTRINE

Under the fugitive disentitlement doctrine, a party "who seeks to invoke the processes of the law while flouting them has no entitlement to call upon the resources of the Court for determination of his claims." *Conforte v. Commissioner*, 692 F.2d 587, 589 (9th Cir. 1982) (cleaned up). Courts exercise their discretion under this

---

[7] *See 2024 Instructions for Form 8854*, IRS.gov, *https://www.irs.gov/instructions/i8854* (last visited January __, 2025).

10

doctrine to deny pretrial relief—including motions to dismiss.[8] Because Ver is a fugitive, the Court should decline to rule on his motion until he is extradited.

### A.    Ver Is a Fugitive

Ver insists that he cannot be considered a fugitive under the doctrine. (Br. at 13 n.9.) But "a defendant need not be present in and leave a jurisdiction to become a fugitive; the mere refusal to report for prosecution can constitute constructive flight," *United States v. Martirossian*, 917 F.3d 883, 890 (6th Cir. 2019), including when one resists extradition, *Schuster v. United States*, 765 F.2d 1047, 1050 (11th Cir. 1985). *See also United States v. Shalhoub*, 855 F.3d 1255, 1263 (11th Cir. 2017); *In re Assets of Martin*, 1 F.3d 1351, 1356 (3d Cir. 1993); *United States v. Catino*, 735 F.2d 718, 722 (2d Cir. 1984).

Though the Ninth Circuit has yet to address constructive flight in the fugitive disentitlement context,[9] it has done so in the civil forfeiture context. There, a fugitive is someone who fails to "enter or reenter the United States in order to avoid criminal prosecution once he [learns] that . . . a warrant for his arrest [has] issued." *United States v. $671,160.00 in U.S. Currency*, 730 F.3d 1051, 1056 (9th Cir. 2013) (cleaned up). Thus, the fact that Ver was outside the U.S. when he was indicted is irrelevant. His knowledge of the charges

---

[8] *See, e.g., United States v. Chung Cheng Yeh*, No. CR 10-00231 WHA, 2013 WL 2146572, at *3 (N.D. Cal. May 15, 2013); *United States v. Stanzione*, 391 F. Supp. 1201, 1202 (S.D.N.Y. 1975).

[9] *See In re Han Yong Kim*, 571 F. App'x 556, 557 (9th Cir. 2014) (finding no clear error in district court's application of doctrine to foreign national who constructively fled by refusing to voluntarily return).

against him and his refusal to submit to this Court's jurisdiction makes him a fugitive. *See id.* at 1056-57.

**B.    The Equities Support Application of the Doctrine**

The fugitive disentitlement doctrine is equitable. *United States v. Gonzalez*, 300 F.3d 1048, 1051 (9th Cir. 2002). The doctrine advances several important interests. First, it "prevent[s] the entry of unenforceable judgments against absent criminal defendants." *Mastro v. Rigby*, 764 F.3d 1090, 1095 (9th Cir. 2014). Second, it avoids wasting resources on defendants who effectively waived their opportunity to participate in the judicial process by flouting the Court's authority. *E.g.*, *Martirossian*, 917 F.3d at 890. Finally, it deters flight and promotes efficient, dignified judicial proceedings. *Ortega-Rodriguez v. United States*, 507 U.S. 234, 242 (1993). These equitable considerations support applying it here.

First, if the court rules against Ver, its ruling is unenforceable while he remains a fugitive. Courts have long declined to entertain motions in such circumstances. *Ortega-Rodriguez*, 507 U.S. at 239-40; *accord Smith v. United States*, 94 U.S. 97, 97 (1876). If Ver wants to challenge his indictment, "[a]ll he has to do is show up." *Martirossian*, 917 F.3d at 890. But until he does, any adverse ruling would amount to an advisory opinion that Ver can merely ignore from the safety of another hemisphere. *Id.*

Second, the Court need not commit time and resources to resolving claims that Ver has waived by his absence. *See Parretti v. United States*, 143 F.3d 508, 511 (9th Cir. 1998). Flight is "inconsistent with the pursuit of judicial remedies" and "constitutes a voluntary waiver" of a defendant's claims while he remains a fugitive. *United States v. Murguia-Oliveros*, 421 F.3d 951, 954 (9th

12

Cir. 2005). Ver's refusal to submit to the Court's jurisdiction thus "disentitles [him] to call upon the resources of the Court for determination of his claims." *Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970) (per curiam).

Third, most importantly, applying the doctrine here would deter Ver from further flight. *Ortega-Rodriguez*, 507 U.S. at 242. Given his vast financial resources and access to an oceanworthy yacht he purchased in Spain after his arrest there, (Ex. 1 ¶¶ 7-8), Ver could flee Spain. Entertaining Ver's pre-arraignment motion and ruling against him could incentivize him to do so. *See Parretti*, 143 F.3d at 510-11.

In contrast, when courts have declined application of the doctrine, those decisions rested on considerations not present here. In *In re Hijazi*, 589 F.3d 401 (7th Cir. 2009), the Seventh Circuit declined to apply the doctrine because Hijazi—unlike Ver—challenged the indictment on jurisdictional grounds, had virtually no ties to the U.S., and because his extradition was impossible due to a lack of an extradition treaty with Kuwait. *Id.* at 407; *see also United States v. Bescond*, 24 F.4th 759, 773 (2d Cir. 2021) (declining to apply the doctrine because "Bescond's presence abroad is unrelated to the American prosecution...."). Ver, by contrast, owned two U.S.-based businesses and until he learned he was under investigation traveled to the U.S. frequently. (Ex. 1 ¶ 9.) Only when he learned he was under investigation, did he cease traveling here. (*Id.*)

In sum, Ver's pre-arraignment motion-made from a safe distance-presents exactly the sort of "heads I win, tails you lose" scenario that the doctrine seeks to prevent. *United States v. Terabelian*, 105 F.4th 1207, 1218 (9th Cir. 2024). Ver "is willing to enjoy the

benefits of a legal victory, but is not at all prepared to accept the consequences of an adverse holding." *Stanzione*, 391 F. Supp. at 1202. So long as he refuses to answer the indictment in the U.S., he should not get to challenge it from Spain. Applying the doctrine now would not bar the Court from ever considering his arguments. The government only requests that the Court entertain them post-extradition.

## V.    MERITS ARGUMENTS

Ver offers three reasons why he should not have to face his criminal charges. First, he asserts that the exit tax is an unconstitutional direct tax that violates the right to expatriate. Second, he claims his charges rest on impermissibly vague statutory foundations because the tax treatment of cryptocurrency was unsettled.[10] Third, Ver alleges that the government secured the indictment through selective quotation. Specifically, he accuses the government of selectively quoting from documents and failing to present purportedly exculpatory evidence to the grand jury.

These arguments quickly fall apart. First, the exit tax is a familiar indirect tax that falls squarely within Congress' taxing powers. Second, indictments cannot be unconstitutionally vague solely because they involve bitcoins. And finally, Ver's allegation of "selective quotation" twists the facts, overlooks the role of the grand jury, and does not come close to meeting the extremely high standard for dismissal for due process violations. As Ver advances no

---

[10] Notably, these first two arguments, if accepted, would not result in a dismissal of the indictment. At most, it would only result in the dismissal of counts 4 and 6, as these are the only counts predicated solely on the exit tax. Counts 1, 2, and 7 also relate to Ver's violation of his obligation to report his assets under I.R.C. § 6039G. Counts 3, 5, and 8 do not concern the exit tax at all.

viable ground to dismiss any of his charges, if the Court reaches the
merits of Ver's arguments, it should deny his motion.

### A.   The Exit Tax Is Constitutional

#### 1.   The Tax Falls Within Congress' Taxing Power

Ver argues that the exit tax is an unapportioned direct tax that
falls outside the Sixteenth Amendment. Ver is wrong.

> #### a.   *The exit tax is an indirect tax that need not be apportioned*

Congress enjoys broad "[p]ower [t]o lay and collect Taxes,
Duties, Imposts and Excises." U.S. Const., Art. I, § 8, cl. 1. These
taxes take one of two forms: direct or indirect. *Moore v. United
States*, 602 U.S. 572, 582 (2024). Direct taxes must be apportioned
among the states according to each state's population. U.S. Const.,
Art. I, § 9, cl. 4. But apportionment is difficult to achieve, so
virtually all federal taxation occurs through indirect methods. *See
Moore*, 602 U.S. at 582 ("Congress has not enacted an apportioned tax
since the Civil War."). Indirect taxes need only be "uniform
throughout the United States." U.S. Const. Art. I, § 8, Cl. 1. This
is a low bar. An indirect tax that applies without "actual geographic
discrimination" generally passes muster. *United States v. Ptasynski*,
462 U.S. 74, 85 (1983).

The Supreme Court has defined direct taxes extremely narrowly to
include only two types of taxes: capitations[11] and taxes on real and
personal property. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S.
519, 571 (2012). All other levies fall under the broad umbrella of

---

[11] Capitations refer to taxes paid by every person "without regard
to property, profession, or any other circumstance." *See Hylton v.
United States*, 3 U.S. (3 Dall.) 171, 180 (1796) (opinion of Chase, J.).

indirect taxes. *See Brushaber v. Union Pac. R. Co.*, 240 U.S. 1, 13 (1916). Unlike direct taxes, indirect taxes take many forms. *See Moore*, 602 U.S. at 582-83. Congress can lay indirect taxes on a wide range of "activities or transactions." *Id.* at 582. These include "customs and excise duties imposed on importation, consumption, manufacture, and sale of certain commodities, privileges, particular business transactions, vocations, occupations, and the like." *Thomas v. United States*, 192 U.S. 363, 370 (1904). The Supreme Court has "long interpreted those categories of taxes broadly." *Moore*, 602 U.S. at 603 (Jackson, J., concurring). Here, the exit tax falls squarely within Congress's indirect taxing power.

### b.    Section 877A creates an indirect tax

The exit tax is an indirect duty, impost, or excise tax and thus need not be apportioned. Like most indirect taxes, the tax is "laid upon the happening of an event." *Tyler v. United States*, 281 U.S. 497, 502 (1930). It is triggered upon the occurrence of one of the specified acts of expatriation. I.R.C. § 877A. As detailed above, *supra* II.C., Congress devoted a considerable portion of the statute's text to articulating the specific chain of events that must occur before one becomes subject to the tax. *See generally id.*

By its nature, the exit tax cannot be direct—it falls outside both categories of direct taxes the Supreme Court recognizes. *See Sebelius,* 567 U.S at 571. It is not a capitation because it is not "paid by every person, without regard to property, profession, or *any other circumstance*.'" *Id.* (quoting *Hylton*, 3 U.S. (3 Dall.) at 175 (opinion of Chase, J.)) (emphasis in original). And it is "plainly not a tax on the ownership of land or personal property." *Id.* It taxes the act of expatriation, not property ownership.

16

Taxes of this kind are nothing new. Since the Founding, Congress has passed—and the Supreme Court has upheld—indirect taxes aimed at specific events or activities. *See Hylton*, 3 U.S. (3 Dall.) at 180 (1796) (tax on carriages that applied to use of the carriage and not the property itself); *Knowlton v. Moore*, 178 U.S. 41, 56 (1900) (estate tax, with death as the operative event); *Patton v. Brady*, 184 U.S. 608, 623 (1902) (tax on tobacco held for sale but not yet sold); *Thomas*, 192 U.S. at 370-71 (tax on contracts for sales of stock); *Flint v. Stone Tracy Co.*, 220 U.S. 107, 151 (1911) (corporate tax based on "privilege of doing business in a corporate capacity"), *overruled on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985); *United States v. Mfrs. Nat. Bank of Detroit*, 363 U.S. 194, 198 (1960) (tax paid on insurance policy, where the taxable event was the "maturing of the beneficiaries' right to the proceeds upon the death of the insured"); *Sebelius*, 567 U.S. at 571 (tax on decision to not obtain health insurance).

Ver ignores this line of cases and insists, without analysis, that indirect taxes must involve the transfer, use, or enjoyment of the taxed property. (Br. at 14.) This is incorrect. While indirect taxes certainly include those levied on transfers of property, they also include taxes "laid upon the happening of an *event*, as distinguished from its tangible fruits." *Tyler*, 281 U.S. at 502 (emphasis added). Congress "undoubtedly may impose" indirect taxes irrespective of any transfer, use, or enjoyment of the taxed property. *Id.*; *accord Knowlton*, 178 U.S. at 56 ("[Whereas d]irect taxes bear immediately upon persons, upon the possession and enjoyment of rights; indirect taxes are levied upon the happening of an event or an exchange."). Such taxes survive review "even when

predicated on something that, if taxed on its own, might require

apportionment or even be nontaxable." *Moore*, 602 U.S. at 603

(Jackson, J. concurring).

The Supreme Court has consistently upheld indirect taxes aimed

at specified acts or events—distinct from any transfer, use, or

enjoyment of the taxed property. In the estate tax context, the Court

views death as the operative event, not the transfer of the

decedent's property to a successor. *See Tyler*, 281 U.S. at 502;

*Knowlton*, 178 U.S. at 81-83 (rejecting the theory that excise taxes

include only taxes that can be "shift[ed]," such as from a

manufacturer or retailer to a consumer). Likewise, the Court has

upheld corporate income taxes as indirect taxes on "the actual doing

of business in a certain way." *Flint*, 220 U.S. at 150. Congress may

even tax *inaction*. *See Sebelius*, 567 U.S. at 571. In *Sebelius*, the

Supreme Court upheld a tax, labeled a "shared responsibility

payment," laid on people who did not obtain health insurance. *Id.* The

Court found the payment was not a direct tax, explaining that "[t]he

whole point of the shared responsibility payment is that it is

triggered by specific circumstances—earning a certain amount of

income but not obtaining health insurance." *Id.*

Just as Congress may impose a tax based on foregoing health

insurance, it may also impose a tax based on foregoing U.S.

citizenship. *See id.* at 571-74. Like the shared responsibility

payment in *Sebelius*, the exit tax applies to a specific circumstance—

here, certain acts of expatriation. I.R.C. § 877A. And because it is

not a capitation or a naked levy on land or personal property, it

cannot be a direct tax. *See Sebelius*, 567 U.S. at 571. Instead, the

18

exit tax falls squarely within Congress's broad indirect taxing power. *See id.*

### c.    Expatriation involves a transfer of property

Even under Ver's flimsy theory that indirect taxes require some transfer, use, or enjoyment of property, section 877A is still an indirect tax. Expatriation fundamentally changes the status of an expatriate's assets. "The United States was historically and continues to be virtually unique in taxing its citizens, wherever resident, on their worldwide income, solely by reason of their citizenship." *Crow v. Commissioner*, 85 T.C. 376, 380 (1985). By contrast, nonresident noncitizens are taxed only on income earned in the U.S. *See* Kuntz & Peroni, U.S. Int'l Tax, Nondiscrimination Clauses, ¶ C4.20, 2000 WL 530244, at *3 (2024). Thus, in substance,[12] when a citizen expatriates and leaves the U.S., his assets follow him. Like a decedent's estate—where the decedent's assets transfer automatically to a separate taxable entity upon his death—expatriation effectively transfers the expatriate's assets from a U.S. citizen who ceases to exist to a non-U.S. citizen who is newly born. *Cf. Murphy* v. *I.R.S.*, 493 F.3d 170, 185 (D.C. Cir. 2007) (tax on "involuntary conversion" of "human capital" into a personal injury damages award was an indirect tax).

When Ver expatriated, his assets effectively transferred from Ver-the-U.S.-citizen to Ver-the-Kittitian-citizen. Those assets ceased to be further taxable by the U.S. unless earned here. This presents the sort of transfer of property that Ver claims,

---

[12] "It is a black-letter principle that, in construing and applying the tax laws, courts generally follow substance over form." *Mazzei v. Commissioner*, 998 F.3d 1041, 1054 (9th Cir. 2021) (cleaned up).

19

incorrectly, indirect taxes require. Thus, even accepting his argument's flawed premise, section 877A would still lay an indirect tax.

> ### d. Even if the exit tax is a direct tax, it still passes constitutional muster

Under the Sixteenth Amendment, even unapportioned direct taxes are constitutional if they are income taxes. Ver contends the exit tax is not a tax on income because there must be a realization event. (Br. at 15.) But that is not the law.

In *Moore v. United States*, the Ninth Circuit was clear that "whether the taxpayer has realized income does not determine whether a tax is constitutional" and that "the Supreme Court has made clear that realization of income is not a constitutional requirement." 36 F.4th 930, 936 (9th Cir. 2022), *aff'd*, 602 U.S. 572 (2024). Ver attempts to reframe this decision as merely recognizing that realization can occur even if someone else other than the taxpayer realized the income. (Br. at 15-16.) But it cannot be true that both "realization is not a constitutional requirement," as the Ninth Circuit held, and that realization by someone *is* a requirement. *Id.* *Moore* thus forecloses Ver's realization theory.

Ver's three attempts to escape *Moore*'s on-all-fours holding all fail. First, to justify this purported "core rule" he cites a two-justice concurrence and the dissent in the Supreme Court's *Moore* decision. Yet, the five-justice majority made clear that it was not deciding or addressing the realization issue. 602 U.S. at 588 n.3. Thus, whatever value they do hold, the concurrence and the dissent carry no force of law.

Second, Ver relies heavily on *Eisner v. Macomber*, 252 U.S. 189 (1920). (Br. at 13, 15.) But *Macomber* was "promptly and sharply criticized" and limited to its facts. *Helvering v. Griffiths*, 318 U.S. 373, 375 (1943). The Ninth Circuit has also held that to the extent *Macomber* "purported to offer a comprehensive definition of the term income as used in the Sixteenth Amendment, it has been discarded," *United States v. James*, 333 F.2d 748, 752 (9th Cir. 1964), a view shared by many courts, *see Moore*, 602 U.S. at 602 & n.1 (Jackson, J. concurring) (collecting cases). It is no wonder then that Justice Jackson warned that "any litigant seeking to sustain her case on the basis of *Macomber* would have to bring back from the dead its Court-created limit on Congress's power." *Moore*, 602 U.S. at 602.

Third, Ver also contends that the Ninth Circuit's rejection in *Moore* of a realization requirement was mere dicta. (Br. 16 n.10.) But Ver fails to explain why, instead attacking the reasoning of the Ninth Circuit's holding (which was correct for the reasons stated above). If anything, it was an alternative holding which remains binding Circuit precedent. *See Best Life Assur. Co. of California v. Commissioner*, 281 F.3d 828, 834 (9th Cir. 2002) ("[W]here a decision rests on two or more grounds, none can be relegated to the category of obiter dictum.") (citation omitted).

Regardless, if the type of strict realization requirement advocated by Ver were accepted, it would call into question numerous other provisions of the Tax Code where Congress imposes taxes on assets constructively sold at the end of a taxable year, including regulated futures contracts, I.R.C. § 1256(a) and (b); securities held by securities dealers, I.R.C. § 475(a); certain assets held by life-insurance companies, I.R.C. § 817A(b); and certain stock in

21

1  passive foreign investment companies, I.R.C. § 1296(a). And Congress

2  taxes holders of discounted debt instruments on imputed interest

3  payments, even though no interest was actually paid, I.R.C. §

4  1272(a)(1)-a factor that drives prices in bond markets. Other

5  examples abound. *See*, *e.g.*, I.R.C. § 305(c) (treating certain

6  transactions, such as "a change in redemption price," as deemed

7  distributions to shareholders); I.R.C. § 467(a) (taxing lessors on

8  accrued rental payments, even if the payments are not made during the

9  taxable year); I.R.C. § 1259 (taxing persons on gains based on "a

10  constructive sale of an appreciated financial position").

11          *e.    Even if realization is required, it is satisfied*

12        Assuming arguendo, realization is a requirement, it is satisfied

13  here. The Supreme Court has long recognized that realization is not

14  equivalent to cash being placed in a taxpayer's hand. *Diedrich v.*

15  *Commissioner*, 457 U.S. 191, 195 (1982). Realization may occur "by a

16  variety of indirect means" that result in a taxpayer being "placed in

17  a better position." *Id.* Thus, when a gain has accrued, Congress is

18  entitled to "choose the moment of its realization and the amount

19  realized, for the incidence and the measurement of the

20  tax." *MacLaughlin v. All. Ins. Co. of Philadelphia*, 286 U.S. 244, 250

21  (1932); *see* 1 Mertens Law of Fed. Income Tax'n § 5:5 (Mar. 2023)

22  (realization can occur by statute).

23        The Supreme Court's decision in *Cottage Saving Ass'n v.*

24  *Commissioner* is instructive. 499 U.S. 554, 565 (1991). There, the

25  Court held that realization occurs when a change causes a property

26  owner to "enjoy legal entitlements that are different in kind or

27  extent." *Id.* at 565. In so holding, it looked towards a trio of

28  decisions from the 1920s about corporate reorganizations. *Id.* at 562-

65 (discussing *United States v. Phellis*, 257 U.S. 156 (1921); *Weiss v. Stearn*, 265 U.S. 242 (1924); *Marr v. United States*, 268 U.S. 536 (1925)). In all three, shareholders of a corporation received shares in a newly formed corporation that was to hold the same property and conduct the same business as the old ones. *Id.* In *Phellis* and *Marr*, however, the new corporations were formed in different states such that the shareholders' shares had "different rights and powers in the same corporation." *Id.* at 565. As such, the Supreme Court held, "as long as the property entitlements are not identical, their exchange will allow both the Commissioner and the transacting taxpayer easily to fix the appreciated or depreciated values of the property relative to their tax bases." *Id.*

Similarly here, the act of expatriating and the transfer of Ver's property from Ver-the-U.S.-Citizen to Ver-the-nonresident-alien changed his legal relationship to his property. For example, consider his ownership of MemoryDealers and Agilestar. Before expatriation, both were S-Corporations that were not separate taxpayers. A distribution of property, such as bitcoins, would only be taxed once to the shareholder. After expatriation, by operation of law, their legal relationship changed. Both companies became C-Corporations, *see* I.R.C. § 1361(a)(2), and were separate taxpayers. Thus, a distribution of those same bitcoins could result in both the corporations and Ver owing tax. Ver's entitlements vis-a-vis the corporations and their property are not the same, allowing "both the Commissioner and the transacting taxpayer easily to fix the appreciated or depreciated values of the property relative to their tax base." *Cottage Sav.,* 499 U.S. at 565.

1    Moreover, section 877A explicitly allows a taxpayer to defer the

2    tax until disposition, a quintessential realization event. I.R.C. §

3    877A(b)(1). Although there are some conditions, the option to defer

4    payment until the time that the taxpayer receives the economic value

5    satisfies the type of realization contemplated by some Supreme Court

6    justices. *Moore*, 602 U.S. at 611 (Barrett, J., concurring)

7    ("realization may take many forms" and "a rigid definition does not

8    capture them all").

9        2.    The Tax Does Not Violate Due Process

10    Ver's argument that section 877A unconstitutionally burdens the

11    right to expatriate fails. First, section 877A imposes no burden on

12    it; it merely eliminates any tax *benefit* from expatriation to certain

13    expatriates. Second, the right of these citizens to expatriate tax-

14    free is not a fundamental right protected by the Fifth Amendment's

15    Due Process Clause. Third, the statute withstands any level of

16    scrutiny.

17        *a.    Section 877A does not burden expatriation*

18    Ver paints the tax as some multi-million-dollar tax imposed on

19    all expatriates. But that is inaccurate. It is only imposed upon

20    those who expatriate *and* are high-net-worth or high-income

21    individuals. Furthermore, no tax is owed unless the gain from the

22    constructive sale exceeds a high threshold. So, to the extent the tax

23    is a burden, it only burdens a small subset.

24    It also imposes no burden on expatriation as such. The INA

25    provides the statutory right to expatriate by specifying several

26    mechanisms for individuals to expatriate-none of which is conditioned

27    on paying the tax. 8 U.S.C. § 1481(a) *et seq*. Further, nothing

28

precludes the State Department from issuing a Certificate of Loss of Nationality ("CLN") based on the failure to pay the tax. *See id.*

And the separate tax that section 877A imposes is essentially "tax neutral." It only imposes taxes that would have been imposed had the taxpayer remained a U.S. citizen and disposed of their property. *See* I.R.C. § 877A(a)(1) & (2). In fact, it imposes a lower tax, because it exempts $600,000 (adjusted for inflation) in gain. *See id.* § 877A(a). At most, it changes only *the timing* of recognition of that gain, and, even then, expatriates may defer payment. *See id.* § 877A(b).

Furthermore, legislative history confirms Congress did not intend to punish or deter citizens from expatriating. The Senate Report states:

> The Committee does not believe that the Internal Revenue Code should be used to stop U.S. citizens and residents from relinquishing citizenship or terminating residency; however, the Committee also does not believe that the Code should provide a tax incentive for doing so. In other words, to the extent possible, an individual's decision to relinquish citizenship or terminate residency should be tax-neutral.

S. Rep. No 110-1, at 43 (2007).

Section 877A thus does not burden the right to expatriate.

### b.    Expatriation is not a fundamental right

Ver's claim that expatriation is a fundamental constitutional right is wrong. The Due Process Clause affords heightened protection for certain enumerated or implied rights. *Dep't of State v. Munoz*, 602 U.S. 899, 910 (2024); *Washington* v. *Glucksberg*, 521 U.S. 702, 720 (1997) (collecting cases). The Constitution is silent on expatriation, so Ver must be asserting an implied right.

25

Contrary to Ver's argument, "the Supreme Court has not recognized that the right to abandon one's citizenship constitutes a *constitutional* right." *Sze v. Johnson*, 172 F. Supp. 3d 112, 121 (D.D.C. 2016) (emphasis in the original), *aff'd sub nom*, *Sze v. Kelly*, 2017 WL 2332592 (D.C. Cir. 2017) (per curiam); *see also L'Association des Américains Acc. v. Dep't of State*, 656 F. Supp. 3d 165, 179 (D.D.C. 2023)

Ver misleadingly suggests, (Br. at 17), that the Supreme Court found such a right in *Glucksberg* and *Savorgnan v. United States*, 338 U.S. 491 (1950). But *Glucksberg* only concerned assisted suicide, not expatriation. 521 U.S. 702. In *Savorgnan,* while the Court stated in dicta that, traditionally, the U.S. has supported the right of expatriation, it also recognized there was a "common-law prohibition of expatriation without the consent of the sovereign." 338 U.S. at 497.[13] It would be inconsistent with the concept of a fundamental constitutional right to require congressional consent before citizens could exercise it.

Ver also mischaracterizes *Murray v. The Charming Betsy*, 6 U.S.(2 Cranch) 64 (1804) and *Maehr v. Dep't of State*, 5 F.4th 1100 (10th Cir. 2021). Regarding *The Charming Betsy*, he quotes from *counsel's argument*, not the Court's opinion, which begins 20 pages later and explicitly declined to decide whether expatriation was possible. *Id.* at 115-20. As to *Maehr*, Ver claims to be referencing the court's holding. But he actually cites to a concurrence. The majority said nothing about expatriation. *Id.* at 1119-22.

---

[13] Ver quotes from the Preamble to the 1868 Act. (*See* Br. at 17.) As *Savorgnan* made clear, the Preamble was just Congress's "declaration of policy", and the Act sought to "apply especially to immigrants into the United States." 338 U.S. at 498 & n.11.

1    Finally, Ver relies on dicta from *Richards v. Sec'y of State*,

2   752 F.2d 1413 (9th Cir. 1985). (*See* Br. at 17.) In that pre-

3   *Glucksberg* case, the panel quoted the 1868 Act's Preamble and cited

4   *Afroyim v. Rusk*, 387 U.S. 253 (1967), for the proposition that the

5   right to voluntary expatriation was "placed" "on a constitutional

6   footing." *Id.* at 1422. Ver quotes from an errant phrase used only

7   once by the panel to describe appellant's argument. *See id*. That off-

8   the-cuff remark should not be construed as creating a fundamental

9   right on par with freedom of speech or marriage rights. Also, the

10  panel did none of the careful and rigorous analysis *Glucksberg* later

11  required when recognizing new constitutional rights, as discussed

12  below.

13    Moreover*,* the panel's dicta misconstrued *Afroyim*, which involved

14  the interpretation of the Fourteenth Amendment's Citizenship Clause,

15  not the Fifth Amendment's Due Process Clause. 387 U.S. at 268.

16  *Afroyim* simply held that there is a right against *involuntary*

17  expatriation and said nothing about the right to expatriate

18  *voluntarily*. *See id.; also Sze*, 172 F. Supp. 3d at 121.[14]

19    This Court should not take the extraordinary step of

20  recognizing-for the first time-a fundamental right to expatriation.

21  The Supreme Court has cautioned courts to "exercise the utmost care"

22

23

24    [14] Ver references 19 U.S.C. § 2432(a), which denies trade
    benefits to countries that impose burdensome emigration taxes. But
25  this provision concerns emigration (changing locality), not
    expatriation (changing citizenship). Further, if it were as Ver
26  claims, then the statute would require denying trade benefits to
    countries like Canada, which impose an exit tax. *See* Income Tax Act,
27  R.S.C. 1985, c.1, § 128.1(4)(b)*; see also* Andrew Appleby, *No
    Migration Without Taxation: State Exit Taxes*, 60 HARV. J. ON LEGIS. 55,
28  66 (2023) ("many nations have implemented national level exit
    taxes").

1  before "break[ing] new ground" in identifying unenumerated rights.

2  *Glucksberg*, 521 U.S. at 720.

3      To do so, this Court would need to engage in a lengthy

4  historical analysis, which Ver does not address. Such an analysis

5  first requires a "careful description" of the asserted fundamental

6  liberty interest, *id.*, which may demonstrate that a court need not

7  decide whether a broad right exists, *e.g., San Antonio Indep. Sch.*

8  *Dist. v. Rodriguez*, 411 U.S. 1, 37 (1973). Here, Ver's asserted

9  liberty interest is the right for similarly situated high-net-worth

10 individuals to expatriate tax-free. (Br. at 17-19.) Then, it requires

11 analyzing whether such a right is "deeply rooted in the Nation's

12 history and tradition." *Glucksberg*, 521 U.S. at 720-21. Here, it is

13 not.

14     First, as discussed above, under the common law there was no

15 right to renounce one's citizenship without the consent of the

16 government. *Afroyim*, 387 U.S. at 258; *see also Shanks v. Dupont*, 28

17 U.S. (3 Pet.) 242, 246 (1830).

18     Congress gave such consent for the first time in the

19 Expatriation Act of 1907, Pub. L. No. 59-193, 34 Stat. 1228. This

20 statute "prescribe[d] the only means by which the expatriation of a

21 native-born American citizen may be accomplished." *Yin v. United*

22 *States*, 31 F.2d 738, 739 (9th Cir. 1929). What is then "deeply

23 rooted" in this Nation's history and tradition is that Congress can

24 prescribe whether and under what circumstances one can expatriate.[15]

25

26

27 _____

[15] Also, the writ of *ne exeat republica*, which forbids a citizen from leaving the country, demonstrates that, historically, there have been limits on a citizen's right to leave, including to ensure the

28 collection of their tax debts. *See United States v. Shaheen*, 445 F.2d 6, 9-10 (7th Cir. 1971).

1    Recognizing a fundamental right here would also conflict with
2    longstanding Supreme Court authority recognizing that the Due Process
3    Clause "is not a limitation upon the taxing power conferred upon
4    Congress." *Brushaber*, 240 U.S. at 24 (collecting cases). Were it
5    otherwise, the Constitution would "conflict with itself by
6    conferring, upon the one hand, a taxing power, and taking the same
7    power away, on the other, by the limitations of the due process
8    clause." *Id.* The Due Process Clause thus only limits taxes that are
9    either takings-in-disguise or fail rational basis review. *Id.* at 24-
10   25; *accord Barclay & Co. v. Edwards*, 267 U.S. 442, 450 (1924); *see*
11   *also Chiles v. United States*, 843 F.2d 367, 370-71 (9th Cir. 1987)
12   (citing *Brushaber*, rejecting claim that tax unduly impinged
13   constitutional right to interstate travel).

14       In sum, there is no fundamental right to expatriate deeply
15   rooted in the Nation's history and tradition. This Court should not
16   now create one.

17           c.    *Section 877A passes rational basis and strict*
18                 *scrutiny*

19       Because the right to expatriate tax-free is not a fundamental
20   right, section 877A need only bear a "reasonable relation to a
21   legitimate state interest." *United States v. Juvenile Male*, 670 F.3d
22   999, 1012 (9th Cir. 2012). Regardless, section 877A would also
23   satisfy strict scrutiny because it is narrowly tailored to further a
24   compelling government interest. *See Juvenile Male*, 670 F.3d at 1012.

25       Maintaining a sound tax system is a compelling government
26   interest. *See United States v. Rodgers*, 461 U.S. 677, 711 (1983);
27   *United States v. Lee*, 455 U.S. 252, 260 (1982). Likewise, the
28   government has a compelling interest in ensuring that the tax code

does not incentivize U.S. citizens to expatriate to evade their U.S. taxes. And the exit tax is narrowly tailored. It is tax-neutral, provides a substantial exemption, and permits deferred payment. Thus, it satisfies rational basis review or strict scrutiny.

**B.  Ver's Void-For-Vagueness Challenge Fails**

Ver presents a confusing hodgepodge of irrelevant facts and arguments to claim that the indictment should be dismissed because it is unconstitutionally vague. Nowhere does he identify the specific statute he believes is vague. Instead, he appears to argue that the *entire* Tax Code is unconstitutionally vague as applied to cryptocurrency. (*See* Br. at 27.) But the actual charged crimes are not vague, nor are the specific underlying tax rules. Ver's claims are nothing more than an attempt to recast willfulness arguments, which are inappropriate here, into constitutional ones and should therefore be rejected.

**1.  Unconstitutional Vagueness Is a High Bar**

Acts of Congress enjoy "strong presumptive validity," *United States v. Nat'l Diary Prods. Corp.*, 372 U.S. 29, 32 (1963), and courts must "construe, not condemn, Congress' enactments," whenever possible. *Skilling v. United States*, 561 U.S. 358, 403 (2010). A criminal law is void only "if it is so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *United States v. Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). Indeed, "perfect

1    clarity and precise guidance have never been required." *Id.* at 308.

2    So long as there is some standard, it does not matter how "time-

3    consuming, difficult, and expensive to determine whether" something

4    falls within that standard. *Lucero*, 989 F.3d at 1102. Finally, in

5    determining whether a statute is vague, a court should look to prior

6    judicial decisions. *Id.* at 1102 n.11.

7              2.    The Charges as Applied Are Not Vague

8          Ver demands that the indictment be dismissed because there was

9    not precise guidance on the overall taxation of bitcoins. (*See* Br. at

10   19.) Not only has no court required such precision, but the operative

11   statutes offer the necessary standards to ensure a person of ordinary

12   intelligence had fair notice that (1) upon expatriation bitcoins had

13   to be reported to the IRS and that a tax had to be paid on any gain,

14   and (2) that the distribution of bitcoins could constitute a taxable

15   dividend.

16         Ver does not argue that a person of ordinary intelligence did

17   not have notice that lying to cheat another of money, evading one's

18   taxes, or lying on a tax return were prohibited. Instead, he asserts

19   that the charges are vague because it had not been definitively

20   established that bitcoins were "property" under the Tax Code, upon

21   which the exit tax must be paid, because they could be foreign

22   currency. (*See* Br. at 19.) But this argument rests on an entirely

23   false dichotomy—foreign currency *is* property under the Tax Code. *See*

24   *infra* V.B.2.a. Either way, bitcoins are clearly subject to the exit

25   tax.

26         Relying solely on section 877A, Ver ignores sections 6039G and

27   301, the other operative tax provisions here, *see supra* 14 n.10,

28

which use different language and are an independent reason to deny Ver's motion. Nevertheless, each provision will be discussed in turn.

### a. Section 877A is clear

Section 877A lays out plain rules for when expatriates owe the exit tax, on what property, and how to calculate it.[16] Under those rules, as described above, "all *property* of a covered expatriate shall be treated as sold on the day before the expatriation date for its fair market value." I.R.C. § 877A(a)(1) (emphasis added). "Fair market value" is such a well-established concept in the law that it is a standard that "truly is ubiquitous," *Estate of Elkins v. Commissioner*, 767 F.3d 443, 449 (5th Cir. 2014). As the Supreme Court and the Ninth Circuit have made clear, in such circumstances, there is no constitutional concern even if there is some difficulty in application. *Williams*, 553 U.S. at 306; *Lucero*, 989 F.3d at 1101.

That leaves the definition of "property" in I.R.C. § 877A. Because this is an as-applied challenge, this Court only need consider whether Ver had fair notice that his conduct was unlawful—in other words, that bitcoins could be property. *See United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013). They clearly were.

Ver tries to muddy the waters by pointing to three so-called "ideal analogs" for the treatment of bitcoins-foreign currency, non-currency capital assets, and financial instruments-and suggesting that their tax treatment under the exit tax may vary. (*See* Br. at 23-25.) Unfortunately for Ver, the law is clear: each constituted "property" under the Code and thus were subject to the exit tax.

---

[16] Ver does not argue that the provisions that determine whether one is a covered expatriate are unconstitutionally vague.

32

1     First, Ver asserts that bitcoins might be foreign currency. (*See*

2 Br. at 22-24.) This is irrelevant, as "foreign currency is generally

3 considered to be 'property' for Federal income tax purposes." *Nat'l*

4 *Standard Co. v. Commissioner*, 80 T.C. 551, 558 (1983), *aff'd*, 749

5 F.2d 369 (6th Cir. 1984); *accord Tiger Eye Trading, LLC v.*

6 *Commissioner*, 138 T.C. 67, 83 n.22 (2012), *aff'd in part, rev'd in*

7 *part on other grounds by Logan Trust v. Commissioner*, 616 F. App'x

8 426 (D.C. Cir. 2015).

9     Second, Ver claims that bitcoins might be non-currency capital

10 assets, which he describes as "property, other than foreign

11 currency." (Br. at 24.) But a non-currency capital asset is also

12 "property" under the Code. *See* I.R.C. § 1221 ("[T]he term 'capital

13 asset' means property held by the taxpayer."). Thus, it is subject to

14 the exit tax. Ver's discussion of the differing accounting treatments

15 is irrelevant because they only apply when one sells "part of [their]

16 holdings," (Br. at 24), while the exit tax requires one to value the

17 entirety.

18     Third, Ver hypothesizes that bitcoins might be treated as a

19 single financial instrument that could impact the computation of its

20 tax basis and holding period.[17] Whatever the import or foundation of

21 this argument, it nevertheless remains irrelevant. Ver was not

22 indicted for miscalculating the holding period or tax basis of his

23 bitcoins. He was indicted because he lied about and concealed the

24 number and value of his bitcoins. Any purported ambiguity in

25 computing the basis or holding period for bitcoins is irrelevant if

26 one, like Ver, conceals the truth about how many bitcoins they own.

27 _____

28     [17] He does not argue that it is unclear whether a "financial instrument" is "property."

33

In addition, Ver's arguments regarding IRS Notice 2014-21 are unavailing. He argues that the Notice treats bitcoin as "property and not virtual[18] currency." (Br. at 25.) But the Notice does not state that property and foreign currency are mutually exclusive, which is consistent with the law discussed *supra* that recognizes foreign currency as a type of property.

Ver's remaining arguments as to the Notice's validity are thus irrelevant and regardless fail. Ver suggests the Notice could not have guided him because it was issued after he expatriated. (*See* Br. at 21, 25.) But the relevant charged crimes were not consummated until at least 2016, when he filed his false expatriation-related tax returns. Thus, he had the requisite notice when he filed his returns *two years* after Notice 2014-21 issued.

And Ver's claim, (Br. at 26-27), that *Loper Bright Enters. v. Raimondo*, 603 U.S 369 (2024), undermined the Notice is wrong. *Loper Bright* altered the deference given to agency *regulations*, *id.* at 412-13, but the Notice is not a regulation, so it was not given *Chevron* deference in any event. *See United States v. Mead*, 533 U.S. 218, 226-27 (2001).

### b.    Sections 6039G and 301 are clear

In moving to dismiss, Ver appears to have forgotten that his obligation to file a Form 8854 comes from an entirely different provision of the Code. And that provision does not use the "property" standard of which he complains. Rather, section 6039G requires expatriates to file a statement detailing their "income, assets, and

---

[18] It appears from context that Ver's reference to "virtual currency" is a typographical error and he intended to say "foreign currency."

liabilities." Having made no argument that this provision is unconstitutionally vague, Ver's motion to dismiss these counts should be denied outright. Regardless, the standard for determining what constitutes an "asset," and specifically whether bitcoins were assets, is clear. In fact, Ver repeatedly describes bitcoin as an "asset" in his brief. (*See* Br. at 7, 10, 20, 21, 22, 26 & n.36.)

Additionally, counts 3, 5, and 8 charge conduct unrelated to the exit tax. Instead, they allege that Ver lied to his return preparer about receiving hundreds of millions of dollars' worth of his companies' bitcoins in 2017, which resulted in Ver filing a false tax return. The distribution would have constituted a taxable dividend, defined as "a distribution of property (as defined in section 317(a))." I.R.C. § 301(a). Section 317(a) defines "property" broadly as "money, securities, and any other property." Once again, Ver's false property-versus-foreign currency distinction is irrelevant because the statute plainly applies to both.

### 3.  Ver Had Notice

Ver's protestations about the uncertainty of the taxation of bitcoins are purely hypothetical, as the indictment makes clear that Ver understood precisely what the rules required of him. He simply chose to break them. The indictment outlines numerous instances where either Ver was advised that he had to report and pay tax on his and his companies' bitcoin holdings or that demonstrate Ver understood he was required by law to do so. (*See*, *e.g.*, Indictment ¶¶ 27(b)(ii), (b)(v), (e)(ii), (e)(iv), (e)(vii), (e)(xvi), (e)(xxii), (e)(xxv).) Since he had actual notice, it strongly weighs against finding the statutes vague as applied to him. *See Kashem v. Barr*, 941 F.3d 358, 373 (9th Cir. 2019).

4.    <u>Scienter Requirements Eliminate Any Vagueness Concern</u>

The three criminal statutes charged here are specific intent crimes, which eliminates any potential vagueness concerns. *See Kawashima v. Holder*, 565 U.S. 478, 483 (2012) (false returns); *United States v. Fisher*, 607 F. App'x 645, 647 (9th Cir. 2015) (evasion); *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013) (mail fraud). Indeed, "[a] scienter requirement in a statute alleviates vagueness concerns, narrows the scope of its prohibition and limits prosecutorial discretion." *McFadden v. United States*, 576 U.S. 186, 197 (2015) (cleaned up). This is because the specific intent elements "relieve the statute[s] of the objection"-which Ver has pressed here-"that it punishes without warning an offense of which the accused was unaware." *Screws v. United States*, 325 U.S. 91, 101-02 (1945).

**C.    Ver's "Selective Quotation" Argument Is Meritless**

Lastly, relying on a tortured characterization of the indictment, Ver seeks dismissal by claiming it relies on "selective quotation" of certain communications. The indictment does nothing of the sort.[19]

In extremely rare circumstances, a district court may dismiss an indictment based on egregious due process violations, or when it finds dismissal is warranted under its supervisory powers. *See United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020). These grounds are extraordinarily narrow. *See United States v. Isgro*, 974 F.2d

---

[19] Ver's claim of interference with his attorney-client privilege is a red herring. The government did no such thing, and regardless, the Ninth Circuit has foreclosed the argument. *United States v. Rogers*, 751 F.2d 1074, 1079 (9th Cir. 1985) ("[I]nducement of a violation of an [attorney's] ethical obligation of confidentiality . . . does not warrant dismissal of an indictment that results from that investigation.").

1091, 1097 (9th Cir. 1992). "One challenging an indictment carries a difficult burden." *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir. 1983).

Dismissal on constitutional grounds requires a finding of pervasive and systemic misconduct that undermines and infringes upon the grand jury's independent judgment and impartiality. *See Isgro*, 974 F.2d at 1095. The misconduct must be "grossly shocking" and so "outrageous as to violate the universal sense of justice." *United States v. Kearns*, 5 F.3d 1251, 1254 (9th Cir. 1993). Similarly, dismissal under a court's supervisory powers requires "flagrant misbehavior" by the government and "substantial prejudice" to the defendant. *Id.* at 1253.

Here, there was no misconduct by the government, let alone the kind of flagrant misbehavior necessary to justify dismissal. Nothing in Ver's motion suggests that the grand jury was misled. The government stands behind the allegations in the indictment, and Ver's exhibits only demonstrate their accuracy.

Attempting to carry his "difficult burden," Ver identifies four allegations in the 26-page indictment that supposedly evidence a pattern of "selective presentation." But they do not.

The first involves paragraph 27(c), which alleges a conversation that occurred in December 2013. In "support," Ver points to an email from April 2013. Ver must be aware that December and April are different such that the indictment could not possibly "misleadingly" summarize a December 2013 conversation by not incorporating statements made eight months earlier.

The second involves paragraph 27(e)(vi), which summarizes an email exchange between Ver and his advisors in August 2015. In

"support," Ver once again offers a completely different document from a different month. And the very exhibit he attaches establishes the allegation's accuracy. (*See* Ver's Ex. 4 at 1.) Ver highlights an email he received in October 2015. The fact that the advice Ver received from his advisors changed over time does not render the indictment's allegation either incomplete or inaccurate. Moreover, nothing suggests that the grand jury did not review the October 2015 email. To the contrary, Ver's so-called exculpatory email is referenced in paragraph 27(e)(xvii).

In the last two, Ver does not present any purported misquotation or misrepresentation but only muses that the "full communications" show Ver "grappling with questions that were impossible to answer." (Br. at 31.) Putting aside that during the same time Ver said he had answers to these supposedly "impossible" questions, (*e.g.*, Indictment ¶ 27(e)(xix)), such musings provide no basis for dismissal.

To the extent Ver's motion can be read as arguing the government failed to present exculpatory evidence, it is black letter law that he "has no right to have exculpatory evidence presented" to the grand jury. *United States v. Fritz*, 852 F.2d 1175, 1178 (9th Cir. 1988).

Nor is dismissal appropriate under the Court's supervisory powers. *See United States v. Williams*, 504 U.S. 36, 52 (1992). Where a defendant's claim is simply that the grand jury was presented with unreliable, incomplete, or misleading information, this constitutes an impermissible challenge to the adequacy or quality of the evidence presented that cannot result in dismissal. *Id.* at 54-55; *Bank of Nova Scotia v. United States*, 487 U.S. 250, 261 (1988) ("[A]n indictment valid on its face is not subject to such a challenge.").

38

## VI.    CONCLUSION

In sum, when appropriate, Ver's motion should be denied.

Dated: January 13, 2025            Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division


_____ /s/

MATTHEW J. KLUGE (PABN 204285)
Assistant Chief, Tax Division
PETER J. ANTHONY (NYBN 4940912)
Trial Attorney, Tax Division

JAMES C. HUGHES
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## **L.R. 11-6.2 Certificate of Compliance**

The undersigned, counsel of record for the United States of America, certifies that this brief contains 10,449 words, which complies with the government's contemporaneously filed, unopposed application requesting an enlarged word limit of 10,500 words.


Dated: January 13, 2025            _____/s/_____

MATTHEW J. KLUGE (PABN 204285)
Assistant Chief, Tax Division